**LIND et al. v. UNITED STATES.**

**No. 274.**

Circuit Court of Appeals, Second Circuit.

June 14, 1946.

Rehearing Denied July 8, 1946.

CHASE, Circuit Judge, dissenting.

———◇———

Frank C. Mason and Mahar & Mason, all of New York City, for appellants.

Nicholas J. Healy, 3rd, Frank P. Cox, and J. Vincent Keogh, all of New York City, for appellee.

Before L. HAND, SWAN and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

The libellants appeal from a decree in the admiralty, granting them only half damages for the loss of the fishing vessel, "Mary," with the crew's personal effects, in a collision with the respondent's ship, "Abner Doubleday," on the night of April 18, 1944. The jurisdiction is under the Suits in Admiralty Act, § 741 et seq. of Title 46 U.S.C.A., and the Public Vessels Act, § 781 et seq. of Title 46 U.S.C.A. The "Mary," seventy feet long and driven by a diesel engine, was in command of one Olsen, one of the libellants; she had a crew of five besides him; and for half an hour before the collision she had been on a steady course southwest by south, about one hundred miles southeast of Ambrose light, dragging her fishing gear and nets from her starboard side at a speed over the ground of between two and one half and three miles an hour. She carried a white masthead light thirty-five feet above the water, the customary red and green running lights in the forward rigging about fifteen feet above the water, and working lights at the same height, at the forward end of her pilot house, with reflectors which cast their light down upon the deck. In addition to these she carried two more white working lights on the under side of her "beam," a starboard white light "at the gallows" to which the fishing nets were attached, and a white light at her stern, a few feet above which was still another white light. She did not however carry the lights required by 79(d) (First) of Title 33 U.S.C.A. of a vessel engaged in trawling; that is to say, in place of a masthead light "a tri-colored lantern so con-

structed and fixed as to show a white light from right ahead to two points on each bow, and a green light and a red light over an arc of the horizon from two points on each bow to two points abaft the beam on the starboard and port sides, respectively; and not less than six nor more than twelve feet below the tri-colored lantern a white light in a lantern, so constructed as to show a clear, uniform, and unbroken light all around the horizon." It was a clear but dark night, and the "Mary" had been bound in a general easterly direction until about 9 p. m., when she went about on a right rudder and at about 9:15 was on the course we have mentioned, southwest by south, from which she did not change until the collision at about 10 o'clock. Some twenty minutes before then Olsen, who had been in the pilot house, left it to go aft and look at the wires of his trawl. Before leaving—in accordance with a practice common to wheelsmen in such vessels—he put a rope on the wheel to hold the rudder in such position that it would offset the drag of the trawl on the starboard side and keep the ship on her course. All five of the crew were engaged either in cleaning or icing the fish, or in some other duty not connected with navigation; there was no look-out and no man on the wheel; the "Mary" was running blind.

The "Doubleday" was a single-screw "Liberty" ship about 420 feet long, in a convoy, which was bound on an easterly course at a speed of between nine and nine and one-half knots. She carried no lights, was completely blacked out, and was painted gray, still better to escape detection; she was in the fifth row of the tenth column of the convoy, counting from the port. The officer on the bridge was the third mate, who had received his papers in the preceding January, and was twenty-two years old; besides him was the look-out, on the gun platform at the bow, forward of the midship housing, and a quartermaster on the bridge with the mate. The master had turned in, thinking that the convoy had cleared the fishing banks. The mate said that about half an hour before the collision at a distance of three miles, he saw a cluster of white lights, two and one-half or three points off his port bow, which later "broadened slightly." The look-out told substantially the same story, except that he thought the lights became finer upon the port bow, as the vessels approached. In any event the "Doubleday" kept her course and speed, for both the mate and the look-out thought that the "Mary" would pass safely under the "Doubleday's" stern. So indeed she would have done, they said, except that she suddenly swung to starboard across their bows when close aboard. Before the actual contact, the mate had called the master to the bridge, but it was then too late to do anything and the ship struck the "Mary" almost at right angles on her starboard side and sank her shortly thereafter. The judge disbelieved the story that the "Mary" had made the sudden swing to starboard, but he nevertheless held her at fault for failing to carry the regulation lights, and for having no look-out. He held the "Doubleday" also for failing to keep out of the way, and therefore he divided the damages. The respondent does not seek to disturb the decree, and the "Doubleday's" faults were indeed inexcusable. To run down a vessel brilliantly lighted, crawling along at less than three miles an hour, which does not change her course or speed, while one is oneself completely blacked out: that was so gross and strange an aberration of seamanship as to warrant no discussion. The whole case turns upon the "Mary's" faults.

Concededly she was guilty of two: she did not carry the proper lights, and she had no look-out for some twenty minutes before collision. In spite of the extreme disproportion between the faults of the two vessels, the situation is not one in which the "Mary" can avail herself of the doctrine of the City of New York, 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84, and The Victory and The Plymothian, 168 U.S. 410, 18 S. Ct. 149, 42 L.Ed. 519, that the fault of the less guilty of the two vessels shall not be jealously scrutinized. That is indeed a proper canon when the facts are in doubt; but here they are not, and we agree with the judge that the libellants stand charged for half damages under the doctrine of The Pennsylvania, 19 Wall. 125, 22 L.Ed. 148, unless they can show beyond reasonable

doubt that the "Mary's" faults had nothing to do with the collision. These must be considered from two different aspects: the failure to carry the regulation light was relevant only so far as its presence misled, or could have misled, those aboard the "Doubleday" as to the "Mary's" future positions; the failure to maintain a look-out was relevant only in so far as a proper look-out could have changed the "Mary's" actual navigation for the better.

█ The "Mary" was as brightly lighted as a Christmas tree; there were lights all over her. The "Doubleday's" mate and look-out made her out at least thirty minutes before the collision when she must have been, not, as they said, three miles, but more than four miles, away. She could be, and actually was, seen to be on a steady course, and to be barely moving. She drew ever nearer, and her bearing must have been constant, for the collision occurred without any substantial change of course or speed by either vessel. Indeed, it is significant that the mate thought she broadened on the "Doubleday's" bows, and the look-out thought she grew finer. In view of all this it appears to us to press scepticism beyond all reasonable bounds to suppose that the presence of a green light on the "Mary's" mast-head could possibly have changed the navigation of the "Doubleday." The green light would have added nothing until, overtaking her, they had come less than two points abaft her beam; and then it would only have told them that she was moving in the same general direction as they. This they knew and they also knew that she was on a converging course which the green light would not have told them. It was not information of where she would be when the "Doubleday's" course crossed hers, that they lacked; they miscalculated her course, and sought to excuse their error by the sudden swing directly across their bows, which was consciously or unconsciously, pure fabrication. For these reasons we hold that the libellants have proved beyond a reasonable doubt that the failure to carry the proper lights did not contribute to the collision.

█ The failure to keep a look-out is much more serious, for it means, as we have said, that for about twenty minutes before the collision the "Mary" was running blind. We must assume, in view of the burden of proof which this puts upon the libellants, that she would have made out the "Doubleday" some time before in fact she did; and if that called for any action, she must be charged with the failure to take it. In spite of this burden we think that she was excusable. Although the "Doubleday" was on the "Mary's" starboard hand, the case was one of "special circumstances," for all navigation rules presuppose that both vessels shall be in sight of each other, and can continually check each other's positions. When they are on crossing courses, one is selected which must "keep out of the way" of the other, and the other is held rigidly to her course and speed, in order that the first shall be able to forecast the second's future positions, by which alone the first can do her duty. This allocation of duties presupposes, however, that the vessels are equally mobile, as appears from § 105, Title 33 U.S.C.A., which provides that when a steamer and a sailing vessel are on meeting courses, the second is the "privileged" one, regardless of their respective positions, because of the greater ease with which the steamer can "keep out of the way." Similarly, when two sailing vessels are meeting, and one of them is close-hauled, and the other is running free, § 102(a), Title 33 U.S.C.A.; or when one "has the wind aft" and the other has not, § 102(e), Title 33 U.S.C.A.

The considerations which lie behind these rules seem to us to apply to the case at bar, but to reverse the respective duties. It was substantially impossible for the "Mary" to "keep out of the way" of the "Doubleday," for, not only could she not have made her out very far ahead; but if she had, she could not have learned the "Doubleday's" course and speed. Moreover, even though Olsen had been at the wheel as he should have been, he would have known that for many minutes and over a distance of three or four miles, his vessel could have been seen by any approaching ship; and he would have been justified in supposing that such a ship would shape her course to avoid him, counting upon the fact

that he could not see her or do anything whatever to avoid her until she was near at hand. Moreover, he would have known that even when he did make her out, any act of avoidance by him would at best have been blindman's buff. If he were well advised, the best he could have done for the safety of both vessels, would therefore have been to hold his own course and speed, on the chance that any such approaching ship, knowing all that he did, would count upon his doing so. That was the navigation which in our judgment the situation demanded. True, we cannot be sure that, if Olsen had in fact been at the wheel, he might not have stopped, like the master of another fishing vessel near by; and we cannot be sure that, if he had stopped, the "Doubleday" would not have crossed his bows. However, that does not make stopping the prudent course. The libellants should not be charged with a fault, however morally culpable, which in fact resulted in the safest navigation open to them under the circumstances. The fact that the prudence of their navigation was unwitting, does not make it any the less prudent navigation; we cannot hold them for the performance of their duty, however little they may be entitled to credit for performing it.

Decree modified to hold the respondent solely liable.

CHASE, Circuit Judge (dissenting).

I agree with my brothers in all but their conclusion that the Mary proved beyond a reasonable doubt that her fault in running "blind" was not in part at least a contributing cause of the collision. It seems to me that the circumstances proved show that the District Judge was right as to that. The Mary was able to stop almost dead at any time because of her slow speed and the drag of her net, and had she seen the Doubleday as soon as she would have seen her had there been an attentive lookout on the Mary, she could easily have stopped a little more than half her length away and avoided the collision. Thus it seems clear that but for her fault in having no lookout preventive means would have been at her command.

The more difficult problem, of course, is whether with the knowledge she should have had, prudent navigation in these special circumstances would have dictated the use of such preventive means by stopping instead of holding her course and speed. I think it would. With a proper lookout she could hardly have penetrated so far into this convoy without seeing any of the ships and should, accordingly, be charged with knowing that she was probably in the midst of a number of ships which might run her down. That the less she moved about in such waters the safer she would be appears almost, if not quite, self evident. The fact that the other fishing boat in similar circumstances did stop and escaped unscathed does not necessarily show that the Mary's navigation was wrong but it is a circumstance which with all the rest seems to me to make it impossible to find that the Mary demonstrated beyond a reasonable doubt that her fault in maintaining no lookout whatever could not have helped cause the collision. For this reason I would affirm the decree dividing the damages.

On Petition for Rehearing.

PER CURIAM.

It is true that those on board the "Doubleday" said that the "Mary" swung to port, and not to starboard; it is also true that the "Doubleday" was not overtaking the "Mary." In these respects we were in error. However, they make not the slightest difference in the result; to suppose that they do, shows a complete failure to understand the grounds on which we put our decision. This will not be mended by repetition.

Petition denied.