**THE HINDOO.**

**THE AUSTRALIA STAR.**

**THE U. S. S. P. C.—616.**

**Nos. 135–204, 133–168, 138–372, 141–141, 139–361, 143–260, 134–34.**

District Court, S. D. New York.
Oct. 18, 1947.

Bigham, Englar, Jones & Houston, of New York City, for Schwab Bros. Corporation and others.

Barry, Wainwright, Thacher & Symmers, of New York City, for Siemens Bros. & Co.

Kirlin, Campbell, Hickox & Keating, of New York City, for Frederick Leyland & Co., Ltd.

Alexander & Ash, of New York City, for Rhode Island Ins. Co.

Reid, Cunningham & Freehill, of New York City, for Cia de Petroleo.

Duncan & Mount, of New York City, for Wessel Duval & Co.

John F. X. McGohey, Edwin Longcope and Max Taylor, all of New York City, for the U. S.

RIFKIND, District Judge.

On the night of September 9, 1944, in the Caribbean Sea, about 150 miles northeast of Cristobal, Panama Canal Zone, a collision took place between the British Steamer Australia Star owned by Frederick Leyland Co., Ltd., and the Hindoo, a Panamanian flag vessel owned by the United States, as a result of which the Hindoo was sunk and the Australia Star and her cargo damaged. The Australia Star had been travelling alone; the Hindoo was being escorted by the U. S. S. PC-616, a United States naval craft. These seven libels, consolidated for trial, require determination of the rights and liabilities of the several vessels and the rights of the owners of cargo on board the two merchant ships.

The night was dark and cloudy; visibility was good; the sea was smooth and the wind slight. The ships had been travelling blacked out through waters where the presence of enemy underseas craft was suspected. The Australia Star was proceeding at full speed of 15 knots, in a southwesterly direction, enroute from the United Kingdom to Cristobal. The Hindoo was travelling at full speed of 10 knots on a course from Guantanamo, Cuba, to Cartagena, Colombia. The PC-616, capable of a maximum speed of 20 knots, was preceding the Hindoo on a zig-zag course at 12 knots. The Australia Star and the PC-616 were equipped with radar; the Hindoo was not,

The collision occurred at 9:32 p. m. Australia Star time.

The PC-616 made her first observation of the Australia Star 37 minutes before collision. The Australia Star first became aware of what later turned out to be the Hindoo about 28 minutes before the collision. The Hindoo saw but misunderstood the Australia Star's green light about 10 minutes before collision but did not become conscious of the presence of that vessel until a minute before collision. The Hindoo and PC-616 were travelling in company and were, of course, at all times aware of each other's presence. Armed with all this foreknowledge it is reasonable to suppose that a collision would not have occurred had there been exhibited a normal degree of diligence and skill. For lack of it one ship was lost and another damaged and three lives were forfeited.

It is impossible to reconcile the claimed course of the Australia Star—237° true—, the claimed course of the Hindoo—108° true—, and the four radar observations of the Hindoo made by the Australia Star (as detailed hereinafter). If each vessel kept the claimed course and speed and if the ra-

dar reports were accurate the collision could not have occurred. At this point, however, it is needless to resolve that problem. Unquestionably the two vessels were on converging courses, with the Hindoo off the Australia Star's starboard bow. First, I shall consider the navigation of the Hindoo, since under normal circumstances she would be the privileged vessel under the starboard hand rule.

Testimony from the crews of both the Australia Star and the PC-616 support the finding that the navigation lights of the Australia Star were thrown on twelve minutes prior to the collision. Because of insufficient lookout, probably caused by preoccupation with extinguishing a fire which had broken out in the quarters of the Hindoo's gun-crew, the Australia Star's lights were at first not seen by the Hindoo. Ten minutes before collision a green light was finally descried but those precious moments were consumed by a search in the signal code for its meaning and the mistaken report that it was an aircraft warning signal from the PC-616. When the light was at last recognized as the starboard navigation light of an unknown vessel, it was too late. The Hindoo switched on its lights, gave a blast on its whistle, and went hard astarboard, but the collision could not be avoided. The Australia Star's bow holed the port side of the Hindoo, forward of the bridge.

The failure of the Hindoo to see the Australia Star's lights was culpable negligence, for which there is no excuse. Citation of cases is unnecessary. Whether or not the starboard hand rule, making the Hindoo the privileged vessel, is applicable to the case at bar, a competent lookout would have given the Hindoo, privileged or not, enough warning so that a successful collision-avoiding maneuvre could have been executed. Insufficient lookout and failure to recognize the meaning of the green light contributed to the collision.

The insistence by proctors for the government that the Hindoo was not at fault, since it was a crossing situation governed by the starboard hand rule, under which the Hindoo, the privileged vessel, had a right to maintain her course and speed, brings up a question of some novelty. The Australia Star, relying mainly on The Jarrix, 1919, 1 Lloyds List L.R. 93 and Lind v. United States, 2 Cir., 1946, 156 F.2d 231, argues that the starboard hand rule applies only to situations where both vessels are or should be visually aware of each other's presence; that, at night when one vessel shows her lights and the other does not, it is for the darkened vessel to keep clear of the lighted one. The Hindoo counters with the contention that the presence or absence of lights is not controlling. All that is necessary is that the burdened vessel be aware of the presence of the privileged ship, and that the Australia Star's radar apprised or should have apprised that ship of the Hindoo's presence. Since the Australia Star knew its own position and course, and the Hindoo's, the starboard hand rule comes into play. The Australia Star's contention is that radar must be ignored for the purposes of the starboard hand rule.

In Lind v. United States, a brightly lit fishing trawler was run down by a blacked-out merchant vessel, member of a convoy. The blacked-out merchant vessel, the privileged ship if the starboard hand rule were to apply, was held solely responsible. In The Jarrix a blacked-out naval escort vessel, busy whipping in its convoy, ran down a lighted merchant ship. Even though the escort was privileged if the starboard hand rule applied, she was held solely responsible. In neither of these cases was the lighted ship aware of the other's presence; neither was equipped with radar.

In very elementary terms, radar operates as follows: From revolving antennae, radio waves are directionally emitted by the ship. If the waves strike an object within the range of the equipment, a little light, or pip, is seen on the radar screen. The bearing of the object is known from the relative axial position of the antennae; its distance is measured by the time it took for the wave to travel out to the object and be reflected back to the receiver. The apparatus is calibrated to show the distance and bearing at a glance. Since the heading of a ship can be plotted from its bearing and distance at two or more points in time, the radar operator can with great accuracy plot

the heading of a ship after taking a number of radar readings. The antennae may be rotated through 360°, either by hand or by motor. In the hand operated apparatus the pip appears only at the moment when the antennae are directed toward the reflecting object. In the motor driven variety the rotation is so rapid as to appear to give a continuous signal of all reflecting objects in all compass directions. On board the Australia Star, a hand operated apparatus was in use. A complete sweep around the circle took 3 minutes.

The Hindoo had no knowledge of the Australia Star's radar. It did not navigate in reliance upon its privilege under the starboard rule. And while it is true that prudent navigation is none the less prudent if practiced unwittingly, Lind v. United States, 2 Cir., 1946, 156 F.2d 231, clearly this was a case of "special circumstances". The Hindoo's navigation was, in the highest degree, imprudent. For all it knew, its presence was a menacing secret to ships in its vicinity. Nevertheless, it gave less than required attention to its own lookout duties and exhibited less than ordinary skill in understanding what it saw. Its faults clearly contributed to the collision.

██ I turn now to the navigation of the Australia Star. The master of that ship received his first warning of the presence of other craft at 9:05, when the radar operator reported two objects 25° on his starboard bow, distant 16,000 and 14,000 yards. At 9:10 the radar operator again reported two objects 20° on the starboard bow distant 14,000 and 9,000 yards. Shortly thereafter the PC-616 passed ahead of the Australia Star, from starboard to port, and by means of a red flashing Morse lamp challenged the Australia Star. The latter answered the challenge by signalling its name and identification. Thereupon the PC-616 commenced delivery, by red blinker light, of a message of which the Australia Star's watch officer read only the word "keep". He could not grasp the rest of it despite prolonged effort.

At 9:20, the radar operator, unsolicited, delivered another report to the master— an object 4° on the starboard bow distant 4,000 yards. Thereupon the Australia Star

switched on her navigation lights and two white range lights. The master neither requested nor received any more radar reports. Had he asked for it he would have received at 9:24 a report showing the presence of an object 2° on his starboard bow, distant 2,000 yards.

Two explanations are offered for the failure of the Australia Star to take more successful measures to avoid collision. The first is supplied by the master. Having put on his lights, he interpreted the failure of the Hindoo to display hers to mean "You carry on your course and speed. I don't want you to do anything. I am keeping clear of you." The second is suggested by her proctors. Since the bearing of the Hindoo on the Australia Star was changing, there was no risk of collision in accordance with the principle that two vessels on crossing courses, keeping steady course and speed, will collide only if the angle of bearing of one upon the other remains constant.

Neither explanation suffices in the presence of the fact that the Australia Star had ready at hand apparatus which made these conjectures and inferences only second best guides for her navigation. By means of her radar the Australia Star could observe the Hindoo and determine her heading and speed with greater exactitude than if the Hindoo had shown her navigation lights. By means of the intelligence radar supplied she could have navigated safely with respect to the Hindoo without relying on the surmises, in the one case, that the Hindoo's continued darkness was in fact a signal, "I am keeping clear of you", and in the other, that the Hindoo was maintaining a steady course and speed. Had the master made more intelligent use of his radar he would have known at 9:24 p. m. that he was almost certainly on a collision course and would have taken precautionary measures.

In the only admiralty case reported involving radar, The Medford, D.C.E.D.N.Y., 1946, 65 F.Supp. 622, Judge Byers severely criticized the navigation of a ship which went at excessive speed through a fog-bank and failed to use the radar equipment it had aboard. The language was strong: (65 F.Supp. at page 626) "The failure of

the Barry to use her radar is the most serious and sinister aspect of these causes. The perfection of that device is thought to have invoked a new concept of the responsibilities attaching to vessels so equipped, touching their handling and operation in or near a fog-bound area."

The emphasis placed by the Australia Star on the words "fog-bound area" as a distinction from the case at bar is unwarranted. The accident in The Medford took place in mid-morning. The necessity for radar at 10:30 a. m. in a fog seems no greater than on a dark night in blackout conditions.

The failure to make adequate use of the radar facilities is all the more astonishing as the master knew that a naval craft was making unsuccessful efforts to communicate with him. The watch officer had managed to translate the word "keep". He could hardly have supposed that the whole message was "keep well". He should have sensed some apprehension which should have sent him scurrying to the radar scope. The notion that a ship, equipped with radar, may, once her navigation and range lights are bright, plunge through the seas at 15 knots in the hope that all other craft will keep clear of it cannot be accepted as a rule of safe and prudent navigation. Lind v. United States, supra, asserts no such proposition. The fishing trawler in that case was "as brightly lighted as a Christmas tree", was crawling along at two and one half to three miles an hour and had no radar.

It has been suggested that to hold the Australia Star at fault is to penalize her because of her equipment with radar. That is a misconception. The conduct which is regarded as negligent on the part of a person of sound vision is not the same as that which is condemned when practiced by the blind. The fault of the Australia Star is that she chose to remain blind when she had the means to see.

Prudent navigation involves taking advantage of all the safety devices at hand. Insofar as it is the judicial function to fit scientific discoveries into the framework of laws not tailored to their measure, the function should be carried out with an eye to the general purposes of the law, and to desirable social ends.

Article 29 of the International Rules for Navigation at Sea, 33 U.S.C.A. § 121 provides: "Art. 29. Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

The negligent use by the Australia Star of her radar equipment contributed to the collision, and was not so slight as to be excused by invocation of the doctrine of The City of New York, 1893, 147 U.S. 72, 85, 13 S.Ct. 211, 37 L.Ed. 84.

Our final concern is with the position of the PC-616. The Australia Star claims that the PC-616 acted in a negligent fashion, that but for her failure to give adequate warnings, the collision would not have occurred, and that because of this negligence, liability attaches.

At 8:55 the escort detected an object in her radar scope, and for a while thought it was a blimp. Later it was recognized as a ship and as stated above, in response to a challenge, the Australia Star gave its call letters, and the unsuccessful attempts at warning the Australia Star began. Only the word "keep" was acknowledged. When collision appeared imminent, a minute or so before it happened, a white search light was directed on the Hindoo by the escort, but in vain. It is obvious that the escort's radar could have kept both vessels under observation, and, when the signalling seemed abortive, could have hauled close to the Australia Star and spoken to her, or sounded the U signal, which means "You are standing into danger" or the K signal, which means "Stop. I have something important to communicate". The escort did none of these things.

Two questions press for an answer. One is whether the fault of the escort in fact contributed to the collision. The second calls for a definition of the scope of the duty owing by the escort to the Australia Star.

The negligence complained of is the failure of the escort to issue more effective warnings to the Australia Star, or to the Hindoo. There is no contention that the PC-616 did anything to cause the accident.

It has not been contended or proved that the Hindoo was navigating less carefully than she would have, had the escort not been there, nor is it contended that the Australia Star would have navigated more carefully but for the presence of the escort. No order was given by the naval vessel to cause or contribute to the collision. In other words, it is for the sin of omission that we are asked to penalize the escort vessel. It is contended that the PC-616, with knowledge of the position of both vessels, should have warned or ordered the Hindoo to alter her course, or stop, or should have given a more effective signal to the Australia Star, to induce her to alter her course or stop.

It is clear that if the PC-616 were a vessel that merely happened on the scene, unrelated to the ships involved in the collision, she could not be held responsible by the Australia Star for her omissions, however thoughtless, so long as she observed the Rules of Navigation, which she did. If, on the other hand, the PC-616 had the Hindoo in tow, and the collision occurred because of the negligence of the PC-616, there is no doubt that the Australia Star could recover. Between these two extremes lies the escort vessel.

To what extent the PC-616 can be held accountable for the navigation of the Hindoo depends, therefore, upon the degree of control exercised by the PC-616. That the Hindoo was obliged to obey the commands of the PC-616 is not enough, since all Allied merchant vessels during the war had to obey the orders of a United States naval vessel, and this fact would not render a naval vessel liable for accidents it might have avoided by issuing prudent and timely orders.

As a matter of fact, as assumed by both parties, the escorted vessel here, despite the presence of its escort, had as heavy an obligation to observe the Rules and to navigate prudently as if she had been alone. In many of the reported cases, ships in convoy have been held liable for damages caused by faulty navigation, and the escorts' liability never suggested. In The Madiana, D.C.S.D.N.Y., 1944, 63 F.Supp. 948, a ship, sailing in a large convoy under the direction of two destroyers and a number of corvettes, and under strict orders as to speed, spacing, etc., was held liable for failure to navigate properly in avoiding a collision with an outside ship. No question was raised there of the escorts' liability. In the absence of proof to the contrary, we must here assume that the Hindoo had at least as much freedom as the ship in The Madiana, and that her negligence prior to the collision could not be ascribed to her dependence on the escort.

It cannot be said that an escort can never be responsible for a collision between its escortee and a stranger. In a case relied upon by the proctors for the Australia Star, Canadian Aviator, Limited v. United States, 1945, 324 U.S. 215, 65 S.Ct. 639, 641, 89 L. Ed. 557, a Canadian ship, The Cavelier, was ordered by United States naval authorities to enter Delaware Bay, and in her transit of the entrance to the bay, to follow directly astern of a certain navy patrol boat. "While following directly astern of the YP 249, as ordered, the Cavelier struck a submerged wreck and sustained serious damages." The Supreme Court overruled the holding of the Circuit Court to the effect that in order to recover from the government under the Public Vessels Act, 1925, 43 Stat. 1112, 46 U.S.C.A. § 781 et seq., the public vessel must itself be the physical instrument by which the damage was caused. The position of the two ships was analogized to the case of a tug negligently grounding its tow; the absence of a tow rope in this case was declared irrelevant. " * * * [F]or all practical purposes she was as firmly fastened to the stern of the YP 249 as if she had been in tow." The Supreme Court reversed the dismissal of the libel and remanded the cause for trial in the district court.

The tug-tow analogy aptly employed in Canadian Aviator, Limited v. United States, is inapplicable to the relationship existing between the PC-616 and the Hindoo. The navigation of the Hindoo was much less dependent upon its escort than was the case with the Cavelier. Furthermore, in the case

at bar a stranger vessel seeks recovery, whereas the Cavelier was the escortee. *Canadian Aviator* is of little help. I am not prepared to extend the doctrine of that case to the ordinary war-time escort relationship.

It is the work of a moment to dispose of the argument that the escort is liable for negligence in the performance of a duty gratuitously undertaken.

 Since the days of Coggs v. Bernard, 2 Ld. Raym. 909, 1 Smith Leading Cases *199, the courts have strained to assess liability, both contractual and delictual, for non-performance or negligent performance of a gratuitous promise, or negligent performance of an unsolicited act. See 1 *Williston, Contracts,* Rev.Ed.1936, § 138, *Beale, Gratuitous Undertakings,* 1891, 5 Harvard L.Rev. 222, *Shattuck, Gratuitous Promises—A New Writ?,* 1937, 35 Mich.L. Rev. 908. But it is an axiom of the law of torts that when the detriment does not flow from the negligent performance, where the undertaking of the act, or its abandonment, is itself not the proximate cause of the injury, there is no liability.

"The voluntary assumption of an undertaking which is not imposed as a duty, although it imposes no obligation to continue future performance of it, does render the one who undertakes it liable *for an injury which results from an improper performance of it.*" 3 Cooley on Torts, 4th Ed.1932, § 478. (Emphasis supplied.)

"One who gratuitously renders services to another * * * is not subject to liability for discontinuing the services if he does not thereby leave the other in a worse position than he was when the services were begun." Restatement, Torts, 1934, § 323(2).

Even if the PC-616 can be said to have undertaken a gratuitous duty to the Australia Star, the evidence is clear (1) that the Australia Star was in no worse position because of the undertaking and (2) that the PC-616's conduct was not a proximate cause of the collision. It would be an alarming innovation in the law to hold that a volunteer who might have prevented an accident by more aggressive action is liable for damages to one whose active and con-tinuing negligence proximately caused the accident.

 In the light of the foregoing the situation resolves itself to this: If the only vessels involved in the collision were the Hindoo and the Australia Star, both were negligent and both share damages. But if an escort is present and by ineffectual means unsuccessfully attempts to prevent the collision, it is asked that the owners of the escort be ordered to pay damages. Since one ship owes another no duty but that of observing the Rules of Navigation, liability can be assessed only by spelling out what would amount to a master-servant or principal-agent relationship between the escort and the escorted vessel, or by making the Australia Star a third party beneficiary to a contract of which neither the existence nor the terms have been proved.

I hold that the failure of the PC-616 to give the K or U signal, or to ring a warning bell, or to take any other precaution that might have avoided the accident, is not such negligence as the Australia Star can complain of.

 Although the rights of the Hindoo against the PC-616 need not be adjudicated, (since both ships were owned by the United States) the fact that one of the causes consolidated for this trial is a libel by Hindoo cargo owners against the United States as owner of the PC-616, makes some consideration of that question necessary.

Analysis of this issue, (and others, already considered) has not been simplified by the failure of the litigants to state accurately the nature of the relationship between a naval escort and a merchant vessel. This failure is undoubtedly due to the fact that no explicit exposition of the jural relationships was thought necessary by those who planned war time convoys. It is a safe assumption, however, that it was not contractual. The convoys were carefully conceived and executed to keep shipping losses at a minimum, the primary function of the escort being protection of its charges against the dangers of enemy action. The delictual liability of an escort ship for unsuccessful attempts to prevent a traffic accident between the escortee and a friendly

vessel was probably not of great concern to naval strategists.

This court is being asked to recognize the existence and breach of a special duty in this regard.

In the absence of evidence establishing such a duty, I cannot hold the PC-616 for negligence actionable by the Hindoo, or, a fortiori, by the Hindoo cargo owners. The position of the Hindoo and its cargo, in the present state of the record, and for the purposes of these causes, is no better than that of the Australia Star.

■ Because the negligence of the crew of the Hindoo was without the privity or knowledge, etc., of the United States, and because the PC-616 has not been guilty of actionable negligence, the petition of the United States for limitation of its liability to the value of the pending freight and other earnings of the S. S. Hindoo is granted.

The Australia Star and The Hindoo will divide the damages. The claims of the several cargo owners will be disposed of accordingly.