## UNITED STATES v. THE AUSTRALIA STAR et al. and six other cases.

### THE HINDOO.

No. 69, Docket 21097.

United States Court of Appeals Second Circuit.

Feb. 9, 1949.

---

Kirlin, Campbell, Hickox & Keating, of New York City (Robert S. Erskine and John F. Gerity, both of New York City, of counsel), for Frederick Leyland & Co., Ltd., appellant.

Barry, Wainwright, Thacher & Symmers, of New York City (John C. Prizer, of New York City, of counsel), for Siemens Bros. & Co., Ltd., and others, appellants.

Bigham, Englar, Jones & Houston, of New York City (Richard F. Shaw, of New York City, of counsel), for Schwab Bros. Corporation and others, appellants.

John F. X. McGohey, U. S. Atty., of New York City (Max Taylor, Sp. Asst. to the U. S. Atty., of New York City, Advocate of counsel), for United States, appellee.

Mendes & Mount, of New York City (Walter B. Hall, of New York City, of counsel), for Wessel, Duval & Co. Inc., and others, appellees.

Before SWAN, CHASE and FRANK, Circuit Judges.

SWAN, Circuit Judge.

This complex litigation results from a collision in the Caribbean Sea, about 150 miles northeast of Cristobal, Panama Canal Zone, between the S.S. Hindoo and the S.S. Australia Star on the night of September 9, 1944. The former, owned by the United States and escorted by the PC-616, a United States naval craft, was proceeding, blacked out, at a speed of 10 knots on a course 108° true, bound to Cartagena, Columbia; the latter, owned by Frederick Leyland & Co., Ltd., and unescorted, was proceeding at a speed of 15 knots on a course 237° true

toward Cristobal. The Australia Star was originally also blacked out but having discovered by means of radar the presence of two vessels (which proved to be the Hindoo and her escort) on her starboard bow, her master turned on her navigation lights and they were clearly visible for twelve minutes before the collision. The Hindoo, which was not equipped with radar, did not turn on her lights until the moment of collision, nor did she keep out of the way. The bow of the Australia Star struck the port side of the Hindoo causing her to sink within a few minutes and to become, with her cargo, a total loss. The Australia Star and some of her cargo also suffered damage. Such, in brief, is the story of the collision. Further details may be found in the district court's opinion, 74 F.Supp. 145, and will be mentioned in discussing the various issues on appeal.

Cross libels were filed by the United States and Frederick Leyland & Co., Ltd., the latter's suit being directed against the United States both as owner of the Hindoo and as owner of the escort vessel. Schwab Bros. Corp. and others, as owners of cargo on the Hindoo, brought separate libels against the United States, as owner of the PC-616,[1] and against the Australia Star. Wessel, Duval & Co., Inc., et al., owners of cargo on the Hindoo, also sued the Australia Star. In both the two last mentioned suits against the Australia Star by the Hindoo's cargo owners the United States was impleaded as owner of the PC-616 as well as of the Hindoo. Siemens Bros. & Co., Ltd., et al., whose cargo on the Australia Star had been damaged, sued the United States as owner of the escort vessel. The United States petitioned, as owner of the Hindoo, for limitation of liability to its interest in that ship and her pending freight amounting to $39,498. All these proceedings were consolidated for trial. The district court held the Hindoo at fault for failure to see the lights of the Australia Star in time to take action to avert the collision; it held the Australia Star at fault for not getting further information by use of its radar after its navigation lights were turned on; it exonerated the escort vessel,

and granted limitation of liability on surrender of the Hindoo's pending freight. Appropriate decrees were entered in the several suits, and were followed by the appeals now before us.

By cross-assignment of errors in the Australia Star's appeal the United States seeks exoneration of the Hindoo. It is urged that this was a crossing situation in which the Hindoo was the privileged vessel under the starboard hand rule of navigation. 33 U.S.C.A. § 104. But the starboard hand rule has no application when the vessel which would normally be the burdened vessel is showing lights and the one which would normally be the privileged vessel is blacked out. This court so held in Lind v. United States, 2 Cir., 156 F.2d 231, 233, where we said that the rules of navigation presuppose that both vessels shall be in sight of each other and can continually check each other's positions. To the same effect is The Jarrix-The Waveney, 1 Lloyd's L.L.Rep. 93, where the Jarrix was showing her navigation lights and the Waveney was not. There the court said, at page 95: "* * * the officer in command of the Waveney had two alternatives. He could either switch on his own lights and bring into operation the crossing rule and put upon the Jarrix the duty of keeping out of the way, while he himself kept his course and speed; or if the naval operation, in which he was engaged, made it right for him not to exhibit his lights, and he chooses, therefore, to remain dark, he must take upon himself the duty of keeping out of the way of the ship which he knows to be approaching him, and to which he himself is exhibiting no lights."

The proctor for the United States attempts to distinguish these cases by the fact that the Australia Star was equipped with radar. This fact will be relevant in discussing, hereafter, the finding that she negligently contributed to the collision; it has no relevance in considering the navigation of the Hindoo, for no one aboard her had any knowledge that the Australia Star was equipped with radar. When the Australia Star turned on her lights, the Hindoo had the two alternatives stated by

1. In this action the United States impleaded the owners of the Australia Star.

the English court as being open to the Wavency. She adopted neither, but continued on into the very jaws of collision before showing her lights. Her explanation indicates gross inattention or gross stupidity or both. Her master said that he saw a green light about 3 to 4 points on the port bow about ten minutes before the collision. After observing it for four or five minutes he sent the third mate to check the signal code to find out what it might mean. The third mate reported that it might indicate the approach of aircraft. When the master finally recognized it as the starboard light of an approaching vessel, she was only about 600 feet distant. During all this time the Australia Star's white range lights had not been observed by the Hindoo although they were burning brightly—a fact corroborated by entries in the log of the PC-616. The rules of navigation recognize the necessity of taking into consideration any special circumstances which may render necessary a departure from the usual rules in order to avoid immediate danger. 33 U.S.C.A. § 112. The absence of lights on the Hindoo was such a circumstance. The district court correctly held that the situation was governed by the rule of "special circumstances." 33 U.S.C.A. § 121; Lind v. United States, supra. The faults of the Hindoo were glaring and, if not the sole cause of the collision, were at least a contributing cause.

The Australia Star seeks reversal of the decision that she was also at fault. This was based chiefly on a finding that her master was negligent in failing to call for further radar reports after turning on her navigation lights. The radar operator made his first report at 9:05 p. m. of two objects, which turned out to be the Hindoo and her escort, 25° on the starboard bow and distant respectively 16,000 and 14,000 yards. Five minutes later he reported that their angle was then 20° and the distance 14,000 and 9,000 yards. Shortly thereafter the PC-616 passed ahead of the Australia Star, from starboard to port, and by means of a flashing Morse lamp challenged her for identification. After the Australia Star had identified herself, the PC-616 commenced to signal a message to "keep clear," of which the Australia Star's watch offi-

cer, despite numerous repetitions, could read only the word "keep." At 9:20 the radar operator reported to the master an object 4° on the starboard bow distant 4,000 yards. It was then that the master switched on the navigation lights, including the white range lights. Thereafter he neither requested nor received any radar report. Although the radar operator took a reading at 9:24 which showed an object 2° on the starboard bow distant 2,000 yards, he thought it unnecessary to report it to the master when he discovered that the navigation lights were on. The Australia Star continued at full speed of 15 knots until she was in the jaws of collision, her master interpreting the failure of the Hindoo to display lights, after his own were switched on, to mean: "You carry on your course and speed. I do not want you to do anything. I am keeping clear of you." Upon these facts the trial court concluded that the Australia Star was negligent in failing to make proper use of its radar and in maintaining its course and speed after the PC-616 commenced signalling a message which the Australia Star was unable to read.

■ The Australia Star contends that she performed her full duty by switching on her lights when the 9:20 radar report showed that the Hindoo was only 4° on her starboard bow and more than two miles away. The Hindoo should have seen these lights and, if she thought danger existed, should have displayed her own lights. Her failure to do so during the twelve minutes before collision was reasonably interpreted by the master of the Australia Star to mean that the Hindoo expected to keep out of the way without any cooperating action by the lighted vessel. The failure of the Hindoo to identify the lights as those of an approaching vessel was so gross a fault that we are urged to apply the principle of The City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 37 L.Ed. 84, and to resolve any doubts as to the propriety of the navigation of the Australia Star in her favor. Despite the strong appeal of counsel's argument, we are not convinced that she was entirely blameless. Had her master continued to call for radar reports, the information so obtained should have suggested to him that

his assumption that the Hindoo could and would keep out of the way was incorrect and might have enabled him to take some avoiding action.[2] Moreover, the master knew that the naval escort vessel was unsuccessfully endeavoring to send him some message. The district court was of opinion that this should have caused him to sense possible danger and to ask for further reports from the radar operator. With this we agree. Consequently we think the Australia Star was correctly held negligent in continuing ahead at full speed without using her radar to obtain further information.

The most difficult question in the case is the correctness of the decision exonerating the naval escort PC-616. The district court's findings of fact state that she unsuccessfully attempted to warn the Australia Star to keep clear and only the word "keep" was acknowledged; that her radar could have kept both merchant vessels under observation and, when the signalling seemed abortive, she could have hauled close to the Australia Star and spoken to her, or sounded the "U" signal, meaning "You are standing into danger," or the "K" signal, meaning "Stop. I have something important to communicate," but she did none of these things; that she made no attempt to signal to or warn the Hindoo when it was or could have been observed that the Hindoo was heading into collision without displaying her lights; that not until a minute or two before collision was a white searchlight directed on the Hindoo by the escort; that neither the Hindoo nor the Australia Star was induced by the presence of the PC-616 to navigate less carefully, and that the escort's conduct was not a proximate cause of the collision. The theory of the district court, as disclosed by its opinion, was that the escort would incur liability only if some affirmative action on her part contributed to the collision; and that she owed no duty to either the Aus-

tralia Star or the Hindoo to give a warning which might have prevented the accident, and consequently her failure to give warning of danger was not negligence.

With this view we disagree. The Hindoo was subject to the orders of her naval escort. Pursuant to such orders she was proceeding, blacked out, on a prescribed course of 108° true, and she could reasonably expect to be warned of any danger known to her escort which would require a departure from such orders. The commander of the PC-616 testified that it was his responsibility to get the Hindoo safely to her destination, and that "It was my duty to do what in my judgment would safeguard the Hindoo." He also admitted that he had authority to give an emergency war time order to any Allied merchant vessel. Nothing was offered by the United States to controvert this testimony as to the escort's duty. The escort's commander was aware of the danger to his escortee and of his own duty and authority to take measures to avoid it. But aside from the abortive attempt to signal the Australia Star and the directing of his searchlight on the Hindoo, at the last minute, he did nothing to avoid this collision. In our opinion this was negligence which contributed to the disaster. See Petition of Anthony O'Boyle, Inc., 2 Cir., 161 F.2d 966.

Closely in point is the English case of The Sobieski, 81 Lloyds List L. R. 61. There the commanding officer of an escort vessel was held liable for failing to warn a vessel in the convoy, the Sobieski, of the presence of another ship, approaching at high speed in fog, with which the Sobieski collided. The court said at page 59: "Commander Layard was a servant of the Crown and owed certain duties to the Crown which in this instance were well understood by him and by those on board the Sobieski. If by negligence he failed to perform these duties and if as a consequence of his negligence the owners of the Sobieski sustain-

---

[2] The district court's opinion, 74 F. Supp., at page 148 states: "By means of her radar the Australia Star could observe the Hindoo and determine her heading and speed with greater exactitude than if the Hindoo had shown her navigation lights."

We think this statement incorrect since radar can show only the distance and bearing of a vessel, not her heading at any moment. By successive radar readings the general direction in which the vessel has moved between them can be plotted, but her course will be discovered more promptly and more accurately by observing her navigation lights.

ed damage, I fail to see how he can escape personal liability for the result of his negligence." [3]

In Canadian Aviator, Ltd., v. United States, 324 U.S. 215, 65 S.Ct. 639, 89 L.Ed. 901, it was held that the remedy afforded by the Public Vessels Act, 46 U.S.C.A. § 781 et seq., is not confined to cases where the public vessel is the "physical instrument" by which the "physical damage" is done but embraces damage resulting from negligence of personnel in the operation of the public vessel. There a Canadian vessel owned by the libellant was ordered by United States Naval authorities to follow directly astern of a United States patrol boat in entering Delaware Bay. While obeying this order, the vessel struck a submerged wreck and the collision, it was alleged, was due solely to the negligence of the patrol boat. The libel was held to state a cause of action against the United States, Mr. Justice Reed saying, 324 U.S. at page 229, 65 S.Ct. at page 646, 89 L.Ed. 901, "for all practical purposes" the Canadian vessel "was as firmly fastened to the stern of the YP 249 as if she had been in tow." The district judge was of opinion that the tug-tow analogy was inapplicable "to the ordinary war-time escort relationship." It is true that the Hindoo was not ordered to follow directly in the wake of her escort but her course and speed and blacked-out lights had been directed by the PC-616 and when the latter saw that the following of these orders by the Hindoo was likely to bring about a collision, we think the principle of the Canadian Aviator required affirmative action to prevent it. A tug may be liable for acts of omission through failure to give necessary instructions to her tow, no less than for negligent affirmative instructions. See British Columbia Mills Tug & Barge Co. v. Mylroie, 259 U.S. 1, 10, 42 S.Ct. 430, 66 L.Ed. 807; The Vale Royal, D.C.Md. 51 F.Supp. 412, 416.

It may well be, as the court below suggests, that one ship owes another no duty but that of observing the Rules of Navigation and that had the PC-616 been a stranger to the two vessels involved in the collision she could not be held liable to the Australia Star for her failure to give the K or U signal, or take some other measure to avoid the accident. But the navy escort was not any vessel that chanced to come upon the scene. She was fully aware that the Hindoo was travelling blacked out. Moreover, the commanding officer of the PC-616 admitted on cross-examination that when the Hindoo's lights failed to come on he "realized that the Hindoo did not see the Australia Star or had misunderstood what they did see." Nevertheless, although admittedly alarmed about the danger of a collision fully four or five minutes before the accident, he made no effort at all to signal the Hindoo or to give warning to the Australia Star. We think this was negligence for which the PC-616 should be held accountable not only to the Hindoo, but to the Australia Star which she permitted to remain a target for the onrushing, darkened Hindoo. The Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., was intended to impose on the United States the same liability (apart from seizure or arrest under a libel in rem) as is imposed by the admiralty law on the private ship-owner.[4]

The United States contends that in any event the British owner of the Australia Star cannot recover under the Public Vessels Act without establishing "international reciprocity," as to which there was no allegation in its pleadings nor proof at the trial. Section 5 of the Act, 46 U.S.C.A. § 785, provides that no suit may be brought under the Act "by a national of any foreign government unless it shall appear to the satisfaction of the court in which suit is brought that said government, under similar circumstances, allows nationals of the United States to sue in its courts." See Lauro v. United States, 2 Cir., 162 F.2d 32. To this the claimant of the Australia Star makes the sound reply that by coming into court first the United States takes the position of a private suitor, asking that justice be done with regard

---

[3] Under the English practice a claim is pressed against the Crown by bringing an action asserting the personal negligence of the commander of the naval vessel.

[4] Canadian Aviator, Ltd., v. United States, 324 U.S. 215, 228, 65 S.Ct. 639, 89 L.Ed. 901.

to the subject matter of the litigation, namely, the collision, United States v. The Thekla, 266 U.S. 328, 45 S.Ct. 112, 69 L.Ed. 313, and that the Thekla rule was incorporated into the Public Vessels Act by section 3, 46 U.S.C.A. § 783.

For the foregoing reasons we think the PC-616 was negligent in failing either to order the Hindoo to change course or turn on her lights, since the effort to warn the Australia Star was known to have been ineffective, and that such negligence imposed liability upon the United States.

■ When two vessels of the same owner contribute to a disaster, the owner may not limit liability without surrendering his interest in both his vessels. The San Rafael, 9 Cir., 141 F. 270, 276; The Alvah H. Boushell, 4 Cir., 38 F.2d 980. Accordingly the owner of the Australia Star should bear one-third of the liability and the United States two-thirds, without limitation of liability. The consolidated proceedings are remanded to the district court for the entry of appropriate decrees.