ORIENT STEAM NAVIGATION COM-
PANY, Limited, Libelant,

v.

The UNITED STATES of America,
Respondent and Cross-Libelant,

v.

The S.S. ORIANA of English Registry, Her Engines, Tackle, Apparel and Furniture, etc., and Orient Steam Navigation Company, Limited, an English Corporation, Cross-Respondent.

No. 62–1584 Y.

United States District Court
S. D. California,
Central Division.

May 6, 1964

Reed M. Williams, Graham, James & Rolph, Long Beach, Cal., for libelant and cross-respondent.

John F. Meadows, Atty., Admiralty and Shipping Section, Dept. of Justice, Los Angeles, Cal., for respondent and cross-libelant.

KILKENNY, District Judge.

On or about the 3rd day of December, 1962, at approximately 0910 hours, a collision occurred between the U.S.S. KEARSARGE and the S.S. ORIANA, in international waters, approximately two miles from the whistle buoy marking the approach to the breakwater entrance to Long Beach and Los Angeles Harbors. The vessels were navigating in fog and restricted visibility. The KEARSARGE was proceeding outbound through the breakwater entrance to the harbor for naval exercises and the ORIANA was inbound to the Port of Los Angeles from San Francisco. While thus proceeding, the stem of the ORIANA struck the starboard bow of the KEARSARGE approximately 25 to 30 feet aft of the stem of said vessel, causing damage to both vessels.

Libelant, and the cross-respondent, Orient Steam Navigation Company, Ltd., is a corporation organized under the laws of England and is the owner and operator of the ORIANA. Respondent and cross-libelant, The United States of America, is the owner of the KEARSARGE, a public vessel of the United States, classified as an aircraft carrier, having an over-all length of 898 feet, with a displacement of 40,327 tons. She was equipped with two steam whistles forward on her stack, having a range of from four to five miles. The KEARSARGE was equipped with several different types of radar, the one used in surface search, piloting in restrictive visibility and tracking surface contacts, being the STS-10. Since these radars were not capable of true motion display, plots of the course and speed of contacts were done manually on a maneuvering board.

The ORIANA is 804 feet in over-all length and has a displacement of 41,923 tons. She carried two radars, one being a Decca model, TM 909. This radar was capable of supplying information on the other ship's aspec, proximate speed and tendency to alter course. This information was furnished directly from the radar display. The manufacturer claims this true motion radar to be the *world's safest* in the all around important anti-collision roll, as well as rendering interpretation of all radar information, safe and certain under all circumstances. Libelant claims this radar was not in use on the morning of the collision insofar as its true motion presentation was concerned. Instead, it is claimed, that it was switched on the relative motion display, which, as I view

the evidence, required manual plotting of contacts in order to obtain the true course and speed of other ships.

It would be of benefit to neither the parties, the Courts, nor the profession for me to give a written report on, and an analysis of, the huge mass of documentary, and other evidence, before me. It is sufficient to say that I have given full consideration to all of such evidence and based thereon and on my personal observation of the witnesses and the weight to be given their testimony, I have arrived at the views herein expressed.

## VISIBILITY

■ One of the disputes, if not the principal one, is whether the restriction of visibility was such that the Fog Rules, of the International Rules of the Road,[1] or the Crossing Rules should apply. It is my view that the Crossing Rules apply only to ships in sight of the other or when the position of the vessels can be definitely ascertained. Lind v. United States, 156 F.2d 231 (2 Cir. 1946); Borcich v. Ancich, 191 F.2d 392 (9 Cir. 1951). The Fog Rules[2] are applicable when the position of the other vessel is unascertained.

■ Whether the Crossing Rules or the Fog Rules are applicable depends on the visibility at the time of and immediately before the collision. Some of libelant's witnesses estimated the visibility at three-quarters of a mile to a mile. If this was the fact, then the Crossing Rules would be applicable and the Fog Rules would be of no significance. Other witnesses for the libelant, and all witnesses for respondent place a much greater restriction on visibility. I was not impressed with the testimony of McGowan, the only live witness for the libelant. His estimate of a visibility of three-quarters of a mile to a mile I feel was greatly exaggerated. The overwhelming weight of the testimony is that the visibility was restricted to from

---

1. *Rule 15(c) (i).*

"A power-driven vessel making way through the water, shall sound at intervals of not more than 2 minutes a prolonged blast."

*Rule 16(a) (b).*

(a) "Every vessel * * * shall, in fog, mist, falling snow, heavy rainstorms or other condition similarly restricting visibility, go at a moderate speed, having careful regard to the existing circumstances and conditions."

(b) "A power-driven vessel hearing, apparently forward of her beam, the fog-signal of the vessel the position of which is not ascertained, shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over."

*Rule 19.*

"When two power-driven vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."

*Rule 21.*

"Where by any of these Rules one of two vessels is to keep out of the way, the other shall keep her course and speed. When, from any cause, the latter vessel finds herself so close that collision cannot be avoided by the action of the giving-way vessel alone, she also shall take such action as will best aid to avert collision."

*Rule 22.*

"Every vessel which is directed by these Rules to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other."

*Rule 23.*

"Every power-driven vessel which is directed by these Rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse."

*Rule 27.*

"In obeying and construing these Rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances, including the limitations of the craft involved, which may render a departure from the above Rules necessary in order to avoid immediate danger."

*Rule 29.*

"Nothing in these Rules shall exonerate any vessel, or the owner, master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper look-out, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

2. Rule 16(a) (b).

650 to 900 yards. The weight of the evidence would fix the visibility at 800 yards.

A principal point urged by libelant is that there was sufficient visibility and, therefore, sufficient time for the Crossing Rules to apply after ORIANA and KEARSARGE came in sight of each other. The soundness of this argument depends on the maneuverability and the stopping characteristics of each vessel. The undisputed evidence, and, commonsense, dictates that massive vessels, such as those under observation, cannot immediately respond to evasive action, but, to the contrary, will continue to advance along their initial course for a substantial distance. The greater the speed, the greater the distance. Likewise, a vessel traveling at a speed which barely gives it steerageway, such as the KEARSARGE, experiences great difficulty in responding to a helm order. Thus, it is clear that vessels of the dimensions and tonnage of those in question would require a considerable distance in order to make the required maneuvers after first determining the approximate course and speed of the other vessel. It is my view that considerably more time, and distance, was required before I could give effect to the Crossing Rules. On all of the evidence in the case, I find that the fog had reduced the visibility to 800 yards or less, that neither of the vessels, proceeding at the speeds at which they were traveling, was, after sighting, capable of evasive action. Proctors for libelant make no contention that the Crossing Rules were applicable prior to visual sighting. Thus, on sighting, each ship had approximately 400 yards, a little over the length of the ship, in which to maneuver. Such being the case, only the Fog Rules could apply.

## LIABILITY

### FAULTS OF KEARSARGE

■ First to be considered are libelant's charges of fault and negligence against respondent.

As to the precise point of collision, the record is in confusion and is so conflicting that the Court cannot fix the point with any degree of certainty. It is my view that it probably occurred about midway between the point claimed by libelant and that claimed by respondent. The KEARSARGE was practically dead in the water, traveling not to exceed one knot, at the time of the collision. Likewise, the speed of the ORIANA was minimal at that point. While I am in complete agreement that the Crossing Rules apply in restricted visibility situations where the vessels sight each other at a distance sufficient to permit maneuvering, The New Hampshire, 136 F. 769 (2 Cir. 1905); The Eelbeck, 1925 AMC 1631, it is my finding that these vessels did not sight each other at a distance to permit such maneuvering. That the KEARSARGE did not give two short blasts of its whistle when turning to port immediately before the accident, nor give three short blasts when she reversed her engines, as shown by the record, such violations of International Rule 28(a), under the circumstances in this case, had nothing whatsoever to do with proximate causation and such violations would not fall within the principles announced in The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148.

Aside from sounding proper signals and proceeding at a safe rate of speed in restrictive visibility, International Rule 16 requires: (1) a vessel hearing a fog signal forward of its beam, from a vessel whose position is not ascertained, to stop its engines, and (2) thereafter she shall navigate with caution until the danger of collision is over. I find that the KEARSARGE sounded a proper signal and was proceeding at a moderate rate of speed. The evidence justifies a finding that the KEARSARGE heard the last of the ORIANA'S fog signals some 30 to 45 seconds prior to visual sighting. KEARSARGE did not stop her engines. Under such circumstances, the command of the rule to stop the engines is mandatory. Lie v. San Francisco and Portland S.S. Co., 243 U.S. 291, 37 S.Ct. 270, 61 L.Ed. 726 (1917) and any delay in this respect is

statutory fault. Johnston-Warren Lines v. United States, 196 F.2d 689 (2 Cir. 1952). Consequently, the rule in the Pennsylvania, supra, places the burden on the KEARSARGE to show that her faults could not have contributed to the collision. In my view, she has not discharged this burden. Admittedly, the KEARSARGE did not stop her engines, either upon hearing the first fog signal from the ORIANA some four or five minutes prior to the collision, or upon hearing the second fog signal some two minutes prior to the collision. Instead, she urges that she was relieved of obligation to stop her engines because she had ascertained the position of the ORIANA on her radar. The authorities are not in agreement on whether a view by radar fulfills the requirement of "ascertainment" under Rule 16(b). Avondale Marine-Ways Inc. v. Tug Crescent Cities, 1960 AMC 1451 (E.D.La.1960); Weyerhaeuser-Pacific, 1959 AMC 1869 (N.D.Cal.1959), I find that I need not apply either rule to the facts before me. Although the KEARSARGE had the ORIANA on its radar for some period of time, there was two or three minutes lag between securing the information from the radar and transmitting that information to the bridge. As a result, at the time the ORIANA'S fog signals were heard on the bridge of the KEARSARGE, the radar data on the ORIANA'S position was practically useless. This is graphically demonstrated by the fact that the bridge was unaware of the last change in course by the ORIANA until the sighting or moments before the sighting. Additionally, the evidence clearly shows that the position of the ORIANA was lost on KEARSARGE'S radar for some time prior to visual sighting. Obviously, it cannot be said that the ORIANA'S position was ascertained during the period of time it was lost on radar. Nevertheless, the KEARSARGE failed to stop her engines until after visual sighting. Of course, if the rule in Weyerhaeuser to the effect that ascertainment of the position of another vessel may be had by radar was ap-plicable to the facts in this case then the Crossing Rules would apply and it would have been the duty of the KEARSARGE to avoid crossing ahead of the ORIANA. It is my finding that the KEARSARGE, after hearing the fog signals of the ORIANA, failed in her obligation to stop the engines and failed to navigate with caution after hearing the first fog signal apparently forward of her beam. The charge that the officers in charge of the navigation of the KEARSARGE failed to properly assess and react to the situation upon visual sighting of the ORIANA is, in my opinion, supported by the evidence. If, the time lost in giving the command for "full ahead" had been utilized in an emergency "full astern", the collision might have been avoided, but, if such had occurred, the bow of the KEARSARGE would probably have struck the ORIANA amidship. All of the foregoing faults and negligence proximately contributed to the collision and resulting damage.

### FAULTS OF ORIANA

█ The faults of the ORIANA contributed to the collision, and resulting damage, as much, if not more, than did the faults of KEARSARGE. In my opinion, as I have previously indicated, this collision would not have occurred if either party was free from substantial fault. A finding that the ORIANA failed to keep a proper lookout is fully justified by the record. Although lookouts were placed on the bow of the vessel, they were not required to report fog signals to the bridge. The undisputed evidence is that the KEARSARGE was blowing a prolonged blast of its whistle every minute, even after she passed into international waters. These signals were not heard by ORIANA'S captain and the rest of the personnel in the wheelhouse. The lookouts were approximately half the vessel forward of those in charge of navigation and it seems probable that the KEARSARGE'S signals would have been reported to those in charge of the ORIANA'S navigation, if the lookouts had been instructed to report. As previously mentioned, I was

not impressed with the testimony of Chief Officer McGowan of the ORIANA. His testimony that he was acting as a lookout while standing on the wing of the bridge, even if worthy of belief, would not relieve the ORIANA, in an extremely foggy sea, of the duty to use the lookouts to report such danger signals. The Felix Taussig, 5 F.2d 612 (9 Cir. 1925); The Supply No. 4, 109 F.2d 101 (2 Cir. 1940). The failure to provide a proper lookout forward on the bow is a violation of Rule 29. United States v. The Adrastus, 190 F.2d 883 (2 Cir. 1951); Weyerhaeuser Steamship Co. v. United States, 174 F.Supp. 663 (D.C. N.D.Cal.1959); The Hawaiian, 38 F. Supp. 574 (D.C.Md.1941).

The ORIANA concedes that she had on board, not only a relative motion radar, but also the Decca true motion radar, previously mentioned. The record is undisputed, that the latter is recognized as the highest achievement in the field of radar. It may be used for a relative motion presentation or for true motion. When used for true motion, the actual motion of the other vessel would appear on the face of the scope. Also, the true motion of the ORIANA would appear. Each of the "tips" as they appeared on the scope would move in the directions in which they were traveling and would move at their actual speed in relation to the selected range scale. The course, being an imput of the ship's gyro compass, is automatically shown.

It is well established that a vessel carrying radar equipment must make proper use of that equipment when in an area of restricted visibility. Afran Transportation Co. v. The Bergechief, 274 F.2d 469 (2 Cir. 1960); The Australia Star, 172 F.2d 472 (2 Cir. 1949), cert. den. 338 U.S. 823, 70 S.Ct. 69, 94 L.Ed. 499 (1949). The Courts are in complete agreement with the rule that prudent navigation requires those in charge of a vessel to take advantage of all safety devices at hand. The Hindoo, 74 F.Supp. 145 (S.D.N.Y.1947) aff'd in part, sub nom. United States v. The Australia Star, 172 F.2d 472 (2 Cir. 1949), cert. den. 338 U.S. 823, 70 S.Ct. 69, 94 L.Ed. 499.

To be accepted is the statement of those in charge of the ORIANA, that the true motion feature of the Decca was not in use at or prior to the time of the collision. No good excuse has been offered as to why it was not in use. I find that such failure constituted serious fault on the part of the ORIANA and that such fault contributed to the collision.

In connection with the failure to use its true motion radar, we must keep in mind that the ORIANA, as distinguished from the KEARSARGE, was not making a plot, relative or true, in order to determine the closest point of approach, course and speed of the KEARSARGE. The overwhelming weight of the evidence is that careful and prudent navigation required the making of such a plot. Even the standing orders of the ORIANA would seem to require the making of such a plot. The Courts have been uniform in their condemnation of such failures. Skibs A/S Siljestad v. S/S Mathew Luckenbach, 215 F.Supp. 667 (S.D.N.Y.1963); Afran Transport Co. v. Bergechief, supra, and Polarus Steamship Co. v. The T/S Sandefjord, 236 F.2d 270 (2 Cir. 1956); White Stack Towing Corp. v. Bethlehem Steel Co., 279 F.2d 419 (4 Cir. 1960); Federal Insurance Co. v. S.S. Royalton, 312 F.2d 671 (6 Cir. 1963). The fact, if it was a fact, that land might have been used as a fix, as claimed by the officers of the ORIANA, would not, on the record in this case, relieve the ship of that duty, nor would the fact, as claimed by the ORIANA, that the breakwater showed on the radar scope and that the contact was in that vicinity remedy the faults. The ORIANA'S change in course toward the KEARSARGE at 0907 can be directly attributed to both the failure to use the true motion radar and failure to keep a plot of the KEARSARGE'S course and speed. She had no marks for the KEARSARGE'S positions at various times, no vector diagrams and no relative plots to

give the KEARSARGE'S true course and speed. Under the circumstances, the ORIANA might as well have no radar equipment.

ORIANA is also charged with traveling at an excessive rate of speed in an area of limited visibility. Rule 16(a) requires every vessel, under such circumstances, to travel at a moderate rate of speed giving careful regard to the existing circumstances and conditions. One of the reasons for this requirement is that there is a reasonable expectancy of meeting other vessels. In approaching, or departing from a busy harbor, it is reasonable to expect the presence in the area of heavy sea traffic. Such an area might be likened to a busy intersection of arterial highways, before the congestion was eliminated, at least to some extent, by overhead crossings and underpasses. Some of the authorities refer to the area at the entrance of a harbor as exceptionally dangerous in nature.

The equipment of the vessel, the use of such equipment, the extent of visibility, the presence of lookouts and all other factors in evidence must be taken into consideration in determining what might be a reasonable or moderate rate of speed in a given case. The ORIANA'S navigating chart shows a slowing down between 0900 and 0905, and some increase in speed thereafter. The evidence justifies a finding that she was traveling at a speed which was neither reasonable nor prudent under the circumstances in restricted visibility where she could not stop within one-half of the distance of visibility. The Silverpalm, 94 F.2d 754 (9 Cir. 1938). The evidence on whether the ORIANA stopped her engines is quite unsatisfactory.

A discussion of, or decision on, other contentions made by the respective parties would add nothing to the validity of my conclusions.

Each party is guilty of substantial fault. That being the fact, the damages must be divided. This memorandum shall serve as my findings. An appropriate interlocutory decree shall be prepared and presented for signature.