## THE MARY.

### LIND et al. v. UNITED STATES.

### No. 17098.

District Court, E. D. New York.

June 20, 1945.

Mahar & Mason, of New York City (Frank C. Mason, of New York City, of counsel), for libelants.

Miles F. McDonald, U. S. Atty., of Brooklyn, N. Y. (Nicholas J. Healy, 3rd, Sp. Asst. to the Atty. Gen., and Frank P. Cox, both of New York City, of counsel), for respondent.

GALSTON, District Judge.

This suit is brought under the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., or in the alternative, under the Public Vessels Act, 46 U.S.C.A. § 781 et seq.

The Mary was a fishing vessel engaged in trawling on the night of April 18, 1944. The Abner Doubleday, a Liberty Ship, one of a convoy, came into collision with the fishing vessel that night at a point about 100 miles southeast of Ambrose Light. The collision took place at about 9:58 P. M. on a clear dark night, with stars visible. The visibility generally was good. The sea was calm and there was no appreciable wind. As a result of the collision the Mary, her equipment and stores, the catch of fish, and the personal effects of her master and crew members were totally lost. The master and all crew members were saved.

In the respective versions of the collision given by the parties, though there are the expected contradictions to be found, nevertheless there are some basic facts that stand out pertinently which were clearly proved.

The Mary was a diesel powered fishing vessel, 70 feet in length, 19 feet 6 inches in beam. Her engine was 135 horse power. The vessel had been built in 1930 and from that time had been in command of Olsen, her master. The Mary had left New York on the evening of April 17, 1944 and had proceeded to the fishing grounds, about 100 miles southeast of Ambrose Light vessel. With the master there were five crew members on board. The Mary was equipped with steel cables about 175 fathoms in length. In passing it is important to note that this equipment was attached to the starboard side of the vessel. On the opposite ends thereof were affixed two gallows doors, which as they dragged the ocean bottom, served to keep the fish nets spread apart. As the gear was towed or dragged, there was a strain on the vessel's steering gear. The testimony is that it was the practice of the wheelsman to use a rope run through a

ring bolt in the deck below, the other end of the rope having an eye looped over one of the hand spokes to keep the wheel steady on the desired course. Also the rudder was in a fixed position to offset the drag off the starboard side. From time to time during the day's fishing operation, it was the practice for the vessel to take in the gear. The master would then turn her about to starboard, slow down the engine and stop it during the process of heaving the doors and net to the vessel's side. The wires were operated by the use of a power winch until the doors were alongside and the net pulled around to drop the fish. The fish was distributed in the hold, and working lights were required for this operation as well as for getting the net aboard. After the net had been emptied it would again be put over the starboard side and the fishing operation continued. The testimony given by those on the Mary established that she carried, on the night in question, a white masthead light about 35 feet above water line. She was provided with and there were lighted on the night in question, her red and green running lights attached to the forward rigging, at a distance of about 15 feet above the water line. These lights were set in screens. In addition to such lights, the vessel also had on the forward part of the pilot house, two working lights with reflectors behind them to cast the light down on the vessel's deck. They too were about 15 feet above the water line. Lower down, about 8 or 10 feet above the water line, on the under side of the beam, were two white working lights. There was a starboard white light at the gallows, about 7 or 8 feet above the water line; and at the stern there was a white light also about 7 or 8 feet above the water line. In addition to all of these there was a white light at the after end immediately above the stern light. This light was extended two feet off the side of the vessel and about 10 feet above the water line.

However, despite the display of all of these lights, it is admitted that the Mary did not display trawling lights as required by the International Rules, art. 9(d), 33 U. S.C.A. § 79(d). Nor indeed was the Mary equipped with such trawling lights. There should have been displayed a tri-colored lantern with a white sector showing from dead ahead to two points on each bow, a green sector showing from two points on the starboard bow to two points abaft the starboard beam, and a red sector showing

from two points on the port bow to two points abaft the port beam.

On the night of the collision the Mary had been proceeding easterly. In the general vicinity there were two other fishing vessels, one the William Landry, which was on a parallel course with the Mary, and on the Mary's port side, a distance off of about one-quarter of a mile; and the fishing vessel Viking, which was on a course westerly, off the Mary's starboard side, a distance of about one and a half miles. Generally the testimony of the masters of these vessels corroborated the testimony given by the Mary as to the setting and visibility of her lights.

After the Mary had proceeded easterly and was about to heave the nets, the deck lights were put on and she started to swing slowly to starboard until she had made a complete circle, and then took a position in a southeasterly direction, then starting ahead at about 9:15 southwest by south. Olsen was at the wheel, and other members of the crew were taking the fish down and putting the catch on ice. Olsen then placed the rope on the wheel and stepped out of the pilot house, going aft a distance of about 10 feet to look at the lead to the wires. This was by way of a precautionary check. Then he saw the loom of a vessel off the starboard side at a distance of 10 or 15 feet. This vessel was the Doubleday, and immediately the stem of the Doubleday struck the starboard side amidships of the Mary.

Now as to the Doubleday and its maneuvering. The Abner Doubleday is about 420 feet in length, 57 feet in beam, is a single screw vessel and is owned and operated by the United States of America as a public vessel. She was equipped with a triple expansion reciprocating engine of 2500 horse power, with a maximum speed of approximately 12 knots when loaded. The Doubleday was a member of an eastbound convoy which was sailing blacked out. She was carrying United States Navy equipment and Lend-Lease supplies· for the British, and occupied the 5th position in the 10th column of the convoy.

It is suggested by the libellant that the collision arose because of the inexperience of the officer in charge on the bridge of the Doubleday. He was the third mate, 22 years old, and had received his third mate's papers in January of 1944. The wheelsman also was a young man 20 years of age. The captain had joined the vessel in No-

vember, 1943, and the Doubleday was the first large vessel in his command. The third mate had been trained at the King's Point Merchant Marine Academy from August to November 1942, and then served as a deck cadet until April 1943. He was then stationed on a training ship moored at Pier No. 1, North River, until June 1943, returning to the Academy for advanced training at that time. The wheelsman had received an able seaman's certificate in December 1943, and had been to sea commencing in April 1943. Bingle was a gunner's mate, third class, and had been in the Navy twenty-three months, though he first went to sea in October of 1943. Bingle was on watch at the time of the collision, stationed on the gun platform at the bow, forward of the midship housing.

The captain of the Doubleday had been up during the day and turned in with his clothes on about twenty minutes to a half hour before the collision. He had assumed at that time that the vessel was clear of the fishing banks because the Doubleday was in an area showing a depth of over 40 fathoms. It is perhaps significant that one of his standing orders was "If in doubt, stop and call me; stop your engine before you call me." He was asked:

"Q. Before you left the bridge, had you given any orders to the third mate about calling you in the event that other vessels were later sighted? A. I did not expect any other vessels.

"Q. So no orders were given? A. I had given him orders. They have signed orders on the bridge, regular night orders."

"Q. Was one of the orders to the effect that in the event they saw another vessel later in the vicinity, they were to call you? A. Only if in doubt."

The third mate testified that about a half hour before the collision, and at a distance of about three miles, he saw a cluster of white lights, two and a half to three points off the ship's port bow; that the distance seemed to be closing, but he nevertheless kept on the same course and speed. It was this third mate who testified that the Mary swung suddenly at right angles and appeared to be crossing the Doubleday's bow, when at a distance from the Doubleday of only 150 feet. The third mate gave a slow down signal when the vessels were about 250 to 300 feet apart. The engine was stopped at 9:56 P. M. and put full astern at 9:57 P. M., and the collision occurred at 9:58 P. M. When the

332

engine was stopped, the third mate put the wheel hard left at a time when the Mary was about 100 feet away. Then the master came into the pilot house and ordered the wheel hard right. At the same time the engine was ordered full astern. It was either the slowing down or the stopping of the engines, as the captain testified, that led him to go from his bunk to the bridge, and not because he had been called by the third mate.

Thus it would appear that the collision arose from several causes. Clearly the Mary was at fault in failing to display proper trawling lights, and though it is sought to excuse that failure by arguing that the absence of the trawling light in no way contributed to the happening of the collision, such an explanation cannot be received. The very charge of inexperience leveled by the libellants against the Abner Doubleday on the contrary would lead to the inference that a tri-colored light which would have been more prominently displayed and more easily understood by an approaching vessel, would greatly have aided the inexperienced navigator. Added to that fault of the Mary, she must also be held at fault for failure to have a lookout and for having even momentarily no one at the wheel in the circumstances prevailing. By that is meant that though the Mary had received no notice or warning of the presence of a convoy, nevertheless it was common knowledge that it was not unusual for blacked-out convoys to sail those waters. Those circumstances called for the utmost caution on the part of vessels navigating in the vicinity. On the other hand the Abner Doubleday cannot be freed of fault. Admission by the third mate that one-half hour before the collision he had seen a cluster of white lights three miles off, afforded compelling consideration of the probable proximity of other vessels. Such a situation called for extreme care. The captain's standing orders for control of the navigation of the vessel in the circumstances should have been followed. Inexperience too seems to have been indicated when at the time that the captain entered the pilot house, the captain gave a hard right order, changing the hard left order of the third mate.

As to the claim that the Mary made a sudden turn to port across the Doubleday's bow, I accept the libellant's version. With the gear out on the starboard side, the fishermen agree that it was impossible for the Mary to make a sudden turn to port. Vessels attempting to do so would run the danger of fouling the rudder and the propeller.

So the Mary and her master and the respondent must both be held at fault; but no fault is attributable to the other members of the Mary. The owner and the master may have a decree for half damages. The members of the crew may have a decree for full damages against both the owner of the Mary and the respondent.