**BORCICH et al. v. ANCICH et al.**

No. 12761.

United States Court of Appeals
Ninth Circuit.

Aug. 16, 1951.

Tripp & Callaway, F. V. Lopardo, Los Angeles, Cal., for appellant.

David A. Fall, Ekdale & Shallenberger and Gordon P. Shallenberger, San Pedro, Cal., Lillick, Geary & McHose, William A. C. Roethke, Lawrence D. Bradley, Jr., Los Angeles, Cal., for appellee.

Before BONE, ORR and POPE, Circuit Judges.

BONE, Circuit Judge.

This action in admiralty grew out of a collision in a dense fog on the morning of November 30, 1948 between two fishing vessels, the oil-screw Marsha Ann and the oil-screw Bear. The collision occurred just outside the breakwater at the entrance to San Pedro Bay in California.

The original libel was filed by seven of the crew members of the Bear against the Marsha Ann and the owners thereof for wages and maintenance. An intervening libel was filed by George Korgan and Sam Bilas, as owners of the Bear, for collision damages and by the two remaining crew members of the Bear for wages and maintenance.

The manner in which the collision occurred is in dispute. The Bear is a wooden vessel 65 feet in length, built in 1917. The Marsha Ann is a somewhat larger vessel being 97 feet in length and equipped with radar.

According to the testimony of the appellees the Bear left the vicinity of Oceanside, California at 5:30 A.M. bound for San Pedro Bay, some 55 miles away, with a cargo of fish caught during the night. About 9:30 A. M. Korgan, who was in charge of the Bear changed the watch, turned the wheel over to Nick Milosevich and went to sleep. At this time the weather was clear. Milosevich encountered fog about 10:30 A.M. and reduced to half speed. The fog became thicker as the Bear progressed and its speed was further reduced until just prior to the collision it was alternately stopping and starting and proceeding at about one and one-half knots per hour. Several members of the crew were on deck acting as lookouts though apparently no one was stationed in the bow. Visibility was about 60 feet. A member of the crew was sounding the fog whistle four or five times a minute and in addition answering the whistles of other vessels. The Marsha Ann was first sighted 40 or 50 feet off the starboard bow proceeding toward the Bear at a right angle. Its speed was estimated by crew members of the Bear at various speeds from two to six miles per hour and several testified that a bow wave was visible. Milosevich reversed the engines of the Bear, but, in spite of this action, the Bear still had a slight forward movement at the time of collision. The Marsha Ann struck the Bear a direct broadside blow approximately amidships.

The crew members of the Marsha Ann give a different version of the collision. Their testimony is that the Marsha Ann, having unloaded a cargo of fish early that morning was proceeding outward through San Pedro Bay toward the fishing grounds. In the middle of the Bay it encountered fog and the radar equipment was turned on. Captain Borcich was at the wheel, a crew member was stationed in the bow and Mr. Zankich, the chief engineer, was in the radar room reading the radar screen and giving continual reports to Captain Borcich.

When the Marsha Ann was abeam of the breakwater at the entrance to San Pedro Bay, Zankich reported one vessel one to two points off the starboard bow and two vessels 45 degrees to port—one of them erratic in its direction. Captain Borcich immediately stopped the engine and the Marsha Ann drifted for five or six minutes. The radar operator continued to observe the three boats until they passed off the

radar screen into the blind spot (that area within 200 yards of the Marsha Ann in which the radar did not function). Captain Borcich was sounding the fog whistle. The Bear was first sighted about twenty-five feet away approaching the bow of the Marsha Ann at a 45 degree angle and proceeding at a speed of about seven miles an hour. Captain Borcich sounded four blasts on the whistle to apprise the Bear of the danger. When the Bear was about 15 feet from the Marsha Ann it turned hard to port and the stern of the Bear swung around and collided with the stem of the Marsha Ann. At the time of the collision the Marsha Ann was virtually dead in the water.[1]

The only damage to the Marsha Ann was a slight damage to the stem but the Bear suffered substantial damage and began to fill with water. It was secured to the Marsha Ann and towed in. Most of its cargo of fish was saved. The Bear was in the process of repair until February 15, 1949 at which time it was returned to the owners.

In this action the owners of the Bear seek to recover for necessary repairs, for surveyor's fees and for loss of the use of the Bear for the time it was being repaired. The nine crew members of the Bear seek to recover their lost earnings and maintenance. The crew members were employed for the sardine season on the lay plan, whereby the crew received 68% of the proceeds—to be divided equally, and the remaining 32% went to the vessel and to the net.

The trial court found substantially as follows: That the Bear was manned by a competent crew, was maintaining a proper lookout and in all other respects being properly navigated; that the Marsha Ann picked up the Bear on its radar screen some minutes before the collision but took no steps to avoid the collision by reversing her engines or coming to a complete stop; that the speed of the Marsha Ann was immoderate under the circumstances. The court further found that these faults of the Marsha Ann, especially her excessive speed, were the direct and sole cause of the collision; that the additional signals given by the Bear, even if not required, did not contribute to the happening of the collision.

On the matter of damages to the Bear the court found that as a result of the collision the reasonable expenditures incurred by the owners of the Bear were $17,770.67 for repairs and $507.94 for surveyor's fees; that 90 frames of the Bear were in such condition that they would have had to be replaced regardless of the collision. The court deducted the cost of labor and material for replacing these frames and awarded $14,678.61 to the intervening appellees for damages to the vessel.

The court found that 38 days was a reasonable time for repairing the Bear and that the total catch during that period would have been 270 tons of fish of a value of $13,500. He awarded to the owners of the Bear 32% of this figure ($4,320) for loss of use of the Bear. The other 68% ($9,180) was awarded to the nine crew members and the one working owner, George Korgan, in equal shares of $918 each for loss of earnings during this period.[2]

Appellants assign as error virtually every finding made by the trial court on the issue of negligence. It is strenuously argued that the collision was caused by the negligence of the Bear and that the Marsha Ann was not at fault. It is not contended by appellants that they are entitled to de novo review in this court but they do contend that the uncontroverted evidence and

---

1. The above summary does not purport to be a detailed account of the testimony of the witnesses. Several witnesses testified for each party and their testimony varies to some extent. We have only attempted to summarize the version of each of the parties.

2. The amount of the prospective catch and the division thereof was arrived at by

stipulation of the parties entered into after the trial court's memorandum decision finding in favor of all libelants. Sam Bilas, the other co-owner of the Bear, was not working on the Bear at the time of the collision. One member of the crew, W. H. Hoopes received only $418 as he earned $500 during the period the Bear was laid up.

the testimony of appellees' own witnesses show the trial court's findings to be erroneous. Among the matters which appellants stress are the following: The testimony of appellees' witnesses shows that the Bear was traveling at an excessive speed, not sounding proper fog signals and failing to maintain a proper lookout; that their testimony shows that the Bear could not stop in one-half its length as required by the International Rules, that the wound in the guard rail of the Bear corroborates appellants' version of the collision; had the collision occurred in the manner and with the force claimed by appellees the Bear would have been cut in half. It is also claimed that the trial judge's reasoning in arriving at his decision was erroneous.

■ It would serve no useful purpose and would unduly lengthen this opinion to discuss the evidence relating to the above noted contentions. We have examined this evidence with care and it is our view that it does not sustain appellants' arguments. The testimony of appellees' witnesses indicates nothing more to us than these witnesses, who had little knowledge of English, were confused. Any inconsistency in their testimony is a matter of credibility to be weighed and determined by the trier of the facts.

The claim by appellants that the nature of the wound in the Bear indicates the manner in which the collision occurred is an assumption unsupported by any expert testimony. It was but one factor of many considered by the trial court in arriving at its decision.

■■ The trial court's findings are supported by substantial evidence. The evidence is conflicting, each of the parties contending that their vessel was virtually dead in the water when the collision occurred. On the record before us we must recognize and give persuasive weight to the superior opportunity of the trial court to observe the demeanor of the witnesses, judge their credibility and to draw just and fair conclusions from the sum of the evidence they tendered. Findings based on oral testimony should not be set aside in the absence of exceptional circumstances not present in this case. Viewing the record as a whole we cannot say that an injustice has been done. Blake v. W. R. Chamberlin & Co., 9 Cir., 176 F.2d 511; United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746.

■ Appellants contend that as the Marsha Ann was to the starboard of the Bear, the Bear was the burdened vessel under Article 19 of the International Rules[3] and had the duty to keep out of the way. We agree with the conclusion of the trial court that this rule does not apply under the circumstances of this case. The visibility was at most 60 feet and there is no evidence that the Bear was aware there was a vessel to her starboard. This rule presupposes two vessels which are in sight of each other and can continually check on each other's position.[4]

### Damages

We consider first the damages allowed to the intervening libelant owners of the Bear for injuries to the Bear and for loss of use of the Bear for a period of 38 days. Louis Sims who was employed by the Underwriters of the Bear to make a detailed survey of the damages to that vessel testified as to what damages were inflicted by the collision and what repairs were necessary. The substance of his testimony is that the Bear was substantially damaged not only at the point of impact but through-

---

3. 33 U.S.C.A. § 104. This rule provides. "104. Steam vessels crossing. Art. 19. When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."

4. Lind et al. v. United States, 2 Cir., 156 F.2d 231; United States v. Australia Star et al., 2 Cir., 172 F.2d 472; Erie R. Co. v. The Invader et al., 2 Cir., 159 F.2d 648; Anglo-Saxon Petroleum Co., Limited, of London, England v. United States, D.C.Mass., 88 F.Supp. 158; The Grenadier v. The August Korff, D.C.Pa., 74 F. 974; Cf. Watts et al. v. United States, D.C.N.Y., 123 F. 105; The Phoenix, 2 Cir., 58 F. 927; The City of Alexandria, D.C.N.Y., 31 F. 427; The Peshtigo, D.C.Ill., 25 F. 488.

out the entire vessel; that the boat was worked on in the usual manner without any unnecessary delay and that $17,770.67 was a reasonable figure for the repairs which resulted from the collision.

Two experts who testified for appellants disagreed with the opinion of Mr. Sims. Mr. Williams agreed that the above figure was a reasonable amount for the work actually done but did not agree that all these repairs were necessary as a result of the collision. His estimate of the damage caused by the collision was $6,500 to $7,000. Mr. DeFever, appellants' other expert witness, set the damages at $5,900. Both witnesses testified that the Bear was in poor condition and that the frames were rotted and would not hold the fastenings. Mr. Williams testified that 25 days was a reasonable time for repairs. He admitted, however, that this did not include the time necessary to haul the boat and to inspect it.

■ Our examination of the testimony of these three witnesses convinces us that the findings in regard to damages caused by the collision are supported by substantial evidence. The witnesses who were well qualified testified at length and in great detail. The trial judge did not allow damages for replacement of 90 frames which replacement he found was not made necessary by the collision. In this instance the appellants' evidence had indicated with particular clarity the poor condition of the frames. In other instances their evidence was not as clear. We cannot say that the findings are clearly erroneous.

We next consider the damages awarded to nine crew members of the Bear for loss of their share of the prospective catch as a result of the collision. By an amendment to their answer appellants set up the defense that the nine crew members of the Bear failed to state a claim on which relief could be granted. On the basis of this amendment appellants objected to the introduction of any evidence on behalf of the crew members as to loss of prospective catch. This objection was overruled. The trial court allowed the crew members to recover on the theory that they were the real parties in interest and the money right-

fully due them should not be channeled through an action by the owners of the Bear who were entitled only to a fraction of it. See the trial court's opinion in 92 F.Supp. 929.

If this case presented only a question of capacity of parties to sue it would not be difficult, in light of the liberal rules of pleading and our decision in Van Camp Sea Food, Inc., v. Di Leva et al., 9 Cir., 171 F.2d 454, to sustain the decision of the trial court. However, the problem we confront is whether the fishermen have suffered a legal injury as a result of appellants' negligence.

Several of the cases cited to us have allowed fishermen (members of the crew) to recover for loss of prospective profits. Thus in The Columbia, D.C.N.Y., 1877, Fed.Cas. No. 3035, where a sloop and net were damaged by negligence, exceptions taken to the report of the commissioner (allowing seamen who libeled for their share to recover for one-sixth of the prospective catch) were overruled. See also The Mary Steele, D.C.Mass., 1873, Fed. Cas. No. 9226 and Lind v. United States, D.C.N.Y., 61 F.Supp. 329.

In 1927 the Supreme Court decided the case of Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290. That was an action by the time charterers of a vessel against the Dry Dock Co. for delay in returning the vessel to service. While the vessel was in drydock the propeller was damaged by the Dry Dock Company's negligence and a new one had to be installed resulting in delay. The time charterers sought recovery for loss of the use of the vessel. Recovery was allowed in the district court and the appellate court approved it though on different grounds. The Supreme Court reversed denying any recovery to the time charterers.

Appellees seek to distinguish the Robins case on the ground that in that case there was a contract between the ship owner and the tortfeasor (Dry Dock Co.), and on the ground that the case dealt primarily with a third party beneficiary contract. While that question was decided by the court, other grounds for recovery were advanced and rejected. The following language of

the Supreme Court clearly negatives any distinction between that case and the instant one by reason of the contract between the owner and the tortfeasor. Commencing 275 U.S. at page 308, 48 S.Ct. at page 135 it is said: "Of course the contract of the petitioner [Dry Dock Company] with the owners imposed no immediate obligation upon the petitioner to third persons as we already have said, and whether the petitioner performed it promptly or with negligent delay was the business of the owners and of nobody else. But as there was a tortious damage to a chattel it is sought to connect the claim of the respondents [time charterers] with that in some way. The damage was material to them only as it caused the delay in making the repairs, and that delay would be a wrong to no one except for the petitioner's contract with the owners. The injury to the propeller was no wrong to the respondents but only to those to whom it belonged. But suppose that the respondent's loss flowed directly from that source. Their loss arose only through their contract with the owners—and while intentionally to bring about a breach of contract may give rise to a cause of action. Angle v. Chicago, St. Paul, Minneapolis & Omaha Ry. Co., 151 U.S. 1, 14 S.Ct. 240, 38 L.Ed. 55, no authority need be cited to show that, as a general rule, at least, a tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with that other unknown to the doer of the wrong. See National Savings Bank v. Ward, 100 U.S. 195, 25 L.Ed. 621. The law does not spread its protection so far. * * *"

The trial judge in the instant case was of the opinion that the owners of the Bear could recover on behalf of the fishermen their prospective shares of the catch relying on Taber et al. v. Jenny et al., D.C. Mass., 1856, Fed.Cas. No. 13720; and United States v. Laflin, et al., 9th Cir., 24 F.2d 683, and that the crew would be able to assert their claim to their aliquot portion of the amount recovered by the owners. He

was of the opinion therefore that the crew members, being the real parties in interest, should be allowed to recover in their own name. This same reasoning was the basis on which the Circuit Court for the Second Circuit approved the recovery in the Robins case. In rejecting this argument in this case the Supreme Court said, 275 U.S. at page 309, 48 S.Ct. at page 135: "The decision of the Circuit Court of Appeals seems to have been influenced by the consideration that if the whole loss occasioned by keeping a vessel out of use were recovered and divided a part would go to the respondents. It seems to have been thought that perhaps the whole might have been recovered by the owners, that in that event the owners would have been trustees for the respondents to the extent of the respondents' share, and that no injustice would be done to allow the respondents to recover their share by direct suit. But justice does not permit that the petitioner be charged with the full value of the loss of use unless there is some one who has a claim to it as against petitioner. The respondents have no claim either in contract or in tort, and they cannot get a standing by the suggestion that if some one else had recovered it he would have been bound to pay over a part by reason of his personal relations with the respondents. * * *"[5]

Whether the owners of the Bear could recover all the anticipated profits including the crew's share is doubtful. The case of United States v. Laflin, supra, involved the wrongful interference by the United States with the sealing operations of the Lydia. The government claimed that the court in allowing damages failed to deduct the wages of employees from the gross income. It was held that the owner could bring the action representing the crew citing Baxter et al. v. Rodman, 1826, 3 Pick., Mass., 435; Grozier et al. v. Atwood, 1826, 4 Pick., Mass., 234; Taber v. Jenny, supra.

Baxter v. Rodman, supra, was an action in assumpsit to recover the value of 30 barrels of oil alleged to be due the plaintiff by virtue of a contract of mateship. An

---

5. See also Agwilines, Inc. v. Eagle Oil & Shipping Co., 2 Cir., 153 F.2d 869.

objection was raised that the master and crew; being joint owners of the proceeds ought to have been joined in the action. It was held that the owners of the vessels are the owners of the proceeds of the voyage. The master and the crew are to receive a stipulated portion of the proceeds but this is only an agreement as to the mode of compensation and gives them no property in the oil. Grozier v. Atwood, supra, involved similar facts and it was there held that the master and crew were improperly joined, citing the Baxter case.

In Taber v. Jenny, supra, the fishermen from the Hillman had killed a whale, but their boat being some distance from the ship they anchored the whale and marked it. The defendants coming upon the whale so marked nevertheless took it to their vessel. In an action by the owners of the Hillman the defendants objected that the assessor had made no deduction for the crew's share in the proceeds of the voyage. It was held that the crew's claim is to a share of the proceeds and they have no property in the fruits of the voyage; that it is the right and duty of the owners to protect the products of the voyage and the seamen then have a right to share in the net avails. The owners must hold the seamen's share for this purpose for otherwise they could get no redress as they have no title to the property and could maintain no action for it.[6]

All three of the above cases are concerned with title to the products of a voyage. They establish that the owner of the vessel owns the products and may recover the crew's share and hold it for them. They deal with products already acquired

and not anticipated profits. Our Laflin case did allow the owner of the vessel to recover the anticipated profits of the crew. But the action in that case was based on an intentional interference with sealing operations and does not fall within the rule of the Robins case.

Appellees rely on Van Camp Sea Food v. Di Leva, supra. In that case this court allowed plaintiff fishermen (whose compensation consisted of a share of the catch) to recover directly for loss of earnings due to damage to the vessel caused by the negligent navigation of another vessel which was also owned and operated by the plaintiffs' employer. This court held that the fishermen could maintain that character of action in their own name on the theory that the owner of the boat could not be expected, as trustee, to bring an action on behalf of the crew against himself for his own negligence. The decision was bottomed on its own peculiar facts and we think that it is not authority for the recovery sought here.[7]

We are only concerned here with the rights of the crew members of the Bear to maintain an action against a third party tortfeasor who negligently disabled the Bear. Their loss arises solely out of their contract with the owners of the Bear to fish aboard that vessel for a share of the catch and under the rule of the Robins case these crew members have stated no claim on which relief can be granted. The judgment allowing a recovery to all of the nine crew members of the Bear[8] is reversed. In all other respects the judgment is affirmed.

---

6. See also Reed v. Hussey, D.C.N.Y., 1836, Fed.Cas.No.11646.

7. See Hayes et al. v. Luckenbach SS Co. et al., D.C.Mass., 92 F.Supp. 684. For other cases involving action by crew members against their employer see Reed v. Hussey, Fed.Cas.No.11,646; The Pokanoket, 4 Cir., 156 F. 241; The Elk,

D.C.Mass., 1938 A.M.C. 714;. Sigurjonsson v. Trans-American Traders, 5 Cir., 188 F.2d 760.

8. John Ancich, John Kaiza, Anton Bogdonovich, Peter Svorinich, Martin Miskulin, Ray Zukowski, William T. Decker, W. H. Hoopes, Nick Milosevich.