**CUSUMANO v. THE CURLEW et al.**

**COSTANZO v. THE CALIFORNIA et al.**

Adm. Nos. 51–4, 51–16.

United States District Court
D. Massachusetts.

March 7, 1952.

· Melvin I. Bernstein, Gloucester, Mass., for Cusumano.

Bingham, Dana & Gould, Seymour P. Edgerton, Boston, Mass., for Costanzo.

FORD, District Judge.

These are cross libels in admiralty and the controversy revolves around a collision of the fishing vessels California and Curlew in Gloucester Harbor in the early morning of November 8, 1950. As a result of the collision the Curlew was sunk and the California damaged. In the Cusumano libel against the Curlew the part-owner libelant seeks damages on behalf of himself and other owners for damage to the California and loss of use, and, for the master and crew for loss of earnings resulting from the detention of the vessel as a result of the collision. In the libel against the California the libelants, on their own behalf as owners and as trustees for the master and crew, seek damages for the loss of the Curlew, loss of her gear, stores of fish, and personal effects of the master and crew.

The facts agreed upon are few in number and may be set forth as follows: the collision of the vessels occurred about day break in the morning of November 8, 1950 *somewhere* in Gloucester Harbor; the weather was clear; the sea was smooth; there was no wind; the California was coming in from fishing and the Curlew going out.

This is not a case involving two separate versions of a collision whose place has been agreed upon. A collision case presents sufficient difficulty when the place of collision is plain, but in this case we have an added difficulty in that the respective parties are in violent disagreement as to where the collision occurred, in addition to how it occurred. All the witnesses who testified for both parties with respect to the liability are interested. They were members of the crew of the respective vessels. The skipper of the Captain Drum, which towed the Curlew before she sank, who could have been helpful in fixing the place of the collision, was not called by either party.

The California, a fishing vessel 104 feet registered length, with a crew of sixteen, left her wharf for mackerel in Gloucester Harbor on November 7. The trip was unsuccessful and the California was on its way back to its Gloucester wharf at day break just before five o'clock on the morning of November 8 when the collision with the Curlew occurred. The California had pilot-house control and at the time of the collision Captain Cusumano was at the wheel and in charge of navigation. From Eastern Point at the southeastern point of the outer or main Gloucester Harbor a breakwater extends in a general westerly direction for a distance of about 600 yards. The breakwater is about five feet wide and at its bottom on both sides is rock filling extending out fifteen feet at low tide. Three hundred feet off the westerly end of the breakwater there is red buoy N6 which marks the easterly edge of the channel at that point. Two hundred and fifty yards northwesterly of the red buoy N6 is a black buoy C7 which marks the westerly edge of the channel. The distance between the red and black buoys and marking the limits of the channel is 250 yards or 750 feet.

The captain of the California, thirty years as a seaman, and six years as a captain, testified he was familiar with the harbor, had been in and out of it on an average of 200 times each year. Captain Cusumano stated, and I find, that the California was making 7½ miles an hour as it approached the breakwater on its starboard and was at that time on a course northeast by north, half north on her way to the wharf at a cove beyond Fort Point in the Inner Harbor which runs off the northeast portion of the Main Harbor. His son, Giovanni Cusumano, was at that time and at the collision on watch in the bow; Maltese, another seaman, was on watch on the starboard side of the California. The captain testified, and I find, that he passed the red buoy N6 off the westerly end of the breakwater on his starboard at a distance of 50–60–70 feet and proceeded on the northeast by north, half north course, a correct course to make the wharf, at a speed of 7½ miles per hour until just before the collision. The captain testified, and I find, that at the time of the collision his running lights were on, together with a mast head light, aft of the pilot-house, and a search light aft to light up a 45 foot seine boat which the California

was towing. The skipper testified that when 150 feet beyond the red buoy N6 he first saw the Curlew's red light 250 feet off his starboard bow (just before it was reported by the bow watch) and heading in a northwesterly direction toward the California; that he immediately blew his whistle five or six times and, just before the collision, when he saw the Curlew's red light, in order to avoid the collision he put his wheel hard to port away from the breakwater on his near starboard, which maneuver turned his vessel approximately thirty degrees to the north northwest; that just before the impact he stopped and reversed his engines; that his vessel slowed to about two miles an hour when the Curlew ran head on into the California's starboard about midship. The captain estimated the speed of the Curlew at about eight miles per hour and he stated the Curlew did not change her course from the time he first saw her until the Curlew hit. When the Curlew did hit he hollered "Who are you?" and he received the reply, in substance, that the Curlew was following the California and he would find out later. He further stated the Curlew was not in the channel, when he first saw her. Also that when the Curlew hit, the California keeled over to port and then righted herself. He stated that he did put his wheel to port rather than starboard because the breakwater was rather close on his starboard side. The captain further testified that because of the cries of the crew that they were about to sink, he headed up the harbor with the intention, if necessary, of beaching the vessel. Before this, he talked to the Captain Drum, which was following the California in, over the radio-telephone and told the Captain Drum that he was leaking badly, was heading in to the beach, and he asked the Captain Drum to take care of the Curlew.

We turn now to the categorically different story of the collision as testified to by the captain of the Curlew. Captain Costanzo of the Curlew, a diesel-engined fishing vessel with a crew of three and pilot-house control, testified he left his wharf in Harbor Cove at about 4:10 o'clock on the morning of November 8; that he

was in the pilot-house at the time and also when the collision took place; that after leaving the wharf he proceeded southward with all lights on down the outer or main Gloucester Harbor at half speed, four and a half to five miles an hour, intending to go through the channel leaving buoy C7 on his starboard and go out to sea. He stated he saw the lights of the California when the latter was somewhere in the vicinity of the breakwater off Eastern Point; that when he first saw the California, 1800 feet away from her, she was showing red and green lights together with her white light. He testified that there was a change of lights on the California—the green light was closed out and the red and white alone showed; that he figured now the California had passed the red buoy N6 off the breakwater and with California's red light showing, he formulated the judgment that they would pass clear—port to port—about 60–75 feet apart. (This estimate was made when he was 1200 feet away.) The captain then stated that "all at once" he lost the red light of the California; that he saw only a green light; that he heard the lookout holler "slow down" and the California proceeded across his bow heading in a northwesterly direction and the Curlew hit the California amidships, bow on. He stated that he got no whistle signal from the California when the latter suddenly changed her course and cut across Curlew's bow; that he had no chance to do anything to avoid the collision; that he reversed his engine but this did not prevent the Curlew from hitting the California. The captain of the Curlew testified that the collision took place at a point in the harbor 1200 feet north from where California's captain stated as the place of the collision. It was also stated by the captain of the Curlew that at the time of the collision, two boats which he had passed were on his port side at respective distances of 60 and 120 feet. There was no testimony as to any part these vessels took in the happenings after the accident which, to say the least, was a bit unusual if the collision took place at the point and in their presence as testified to by Curlew's captain. After the collision, the captain called for

help and the Curlew was towed by the Captain Drum which was following the California to a point north of Tenpound Island where it sank. The captain and two members of the crew took to Curlew's dory and one remained on board. It may be stated in passing that the main reason the Curlew sank was because its false bow was stove in exposing a rotting bow inside which was practically demolished by the collision.

It would be of no assistance if the testimony of the members of the crew of the California was set forth in detail. Suffice it to say that all the members of the crew of the California who testified, and the majority of them did, in the main, told the same story as the skipper of the California. The engineer of the California, with experience dating back thirty-four years, presented the clearest evidence. He was on deck, before and at the time of the collision, and in a position to see what happened. He stated, as did the captain, that the Curlew gave no signals; that she was making about seven and a half miles per hour; that the California did give five or six whistle signals a minute or a minute and a half before the collision; that the Curlew hit the California head-on at amidship; that he observed the man at the wheel of the Curlew and he seemed "paralyzed from fright". The bow watch also testified to this circumstance. As the latter put it, this man at the wheel "did not move at all" as he headed for the California. The engineer who, of course, was familiar with the speeds of the California from the sound of the engine, substantiated the captain.

There is no question that the point of impact between the vessels was on the starboard side of the California about ten feet forward of the pilot-house and no side swiping was indicated. The damage to the California was all "straight up and down" —at the top guard rail, lower guard rail and on several planks at or about the water line.

One significant piece of testimony which had the ring of credibility was given by one of the members of the crew of the California. Seaman LoGrande testified that he rode with the captain of both boats in the automobile taking them to the Coast Guard hearing immediately after the collision and he talked with Captain Costanzo of the Curlew. LoGrande testified he said to Captain Costanzo: "How is it, that you smashed our boat up?" and the reply was: "At the time of the accident I was not at the wheel."

One other incident at the trial that is of help in resolving the question of credibility in this case where the versions given of the collision are as opposite as the poles was the reluctance of the captain of the Curlew to agree with counsel as to the place of the accident. Apparently, the captain of the Curlew at the trial changed the place of the collision from the place he pointed out at the Coast Guard hearing to a point much farther north (about 400–500 yards). The place of the collision as testified to by the captain at the Coast Guard hearing was reasonably close to where California's captain testified it was. It seemed to me the change was made to avoid the presence of the breakwater as a factor in the collision, a circumstance I shall refer to later. The Coast Guard testimony was not formally offered at the trial but from the manner of the testimony at the trial and the attempt of the witness to make it appear the interpreter or reporter at the Coast Guard was in error, led me to infer the Costanzos made the contradicatory statements at the Coast Guard hearing.

Although the only member of the crew of the Curlew who was on deck at the time of the collision substantiated the story of Curlew's captain, yet he by no means impressed me as giving the correct version. His description of California's lights just before the collision differed from that given at the Coast Guard hearing. His testimony at the Coast Guard was consistent with the libelant's story here; his testimony at the trial as to the lights was consistent with Curlew's captain's testimony. It was evident to the court he changed his testimony as did Curlew's captain. He was the lookout, Angelo Costanzo, the father of the captain of the Curlew, and was 67 years of age. The other members of the crew, two, stated they were below and did not

see the California before the accident. The lookout was not inquired of as to the place of the accident, nor were the other members of the crew. It could be they would differ from the captain of the Curlew. After interrogation by the court of one of the witnesses for respondent, it appeared he either did not know or was reluctant to state the exact place of the accident. I find that the version of the collision as testified to by the captain of the California is, in the main, the true one. (Collision cases cannot be decided with a micrometer.) From this, it is obvious that I do not credit the testimony of the captain of the Curlew. It was, in my belief, fabricated. I cannot get myself to find on his story that the captain of the California would leave his starboard course and cut northwesterly to port and across the bows of three vessels and head for Dolliver's Neck on the westerly side of Gloucester Harbor. That hardly makes sense. California's wharf was in an entirely different direction—northeast—and it taxes credulity to believe she would for any conceivable reason take a course in a direction for which no rational basis existed.

I attach great significance to the statement of Curlew's captain to witness Lo-Grande that he was not at the wheel the morning of the collision. It explains why the Curlew was cutting across the channel to get between buoy N6 and buoy C7. The man in the wheel-house, in all probability, was not familiar with the harbor and proceeding south on his way out to sea found himself headed toward the breakwater. When he realized his position, he was compelled to take a northwest course to clear the breakwater which itself ran in a west northwest direction and get back into the channel. This would account for the northwest course of the Curlew at the time of the collision and bring the Curlew across the channel headed toward the California. The only other member of the crew capable of handling the wheel of the Curlew was Mario Costanzo, a part-owner, a nephew of the captain, who testified that at times he took the wheel when the vessel got outside the harbor. It could have been he, in my opinion, who was at the wheel that

morning and was "paralyzed with fear" as the engineer of the California testified.

Whoever was at the wheel, and I cannot definitely find who was, the captain of the Curlew, who was in charge of the navigation, testified at one point in the trial that on coming out of the harbor after he passed buoy N10 to buoy N8, he fixed his course as southeast by south. This would take the Curlew back of the breakwater where I find it was before it cut across the channel, and as argued by libelant "a menace to navigation."

Many photographs of the damage done to the California by the collision were introduced in evidence and they support the testimony of the captain of the California. The damage done to the California as indicated was straight up and down, consistent with a vessel striking her at about right angles while she was practically at a standstill in the water. The lack of sideswiping is inconsistent with the version of the collision given by Curlew's captain. Also, the damage suffered by the Curlew and evidenced by the photographs reflect that the Curlew hit the California head-on, not at any angle as testified to by the Curlew's captain. The damage to the Curlew was equally distributed on both sides of her false bow. Had the collision occurred as indicated by Curlew's captain on Exhibit "E", the damage to Curlew would have been on her port bow and not equally distributed on both sides of the bow.

The Curlew argues that even if the California's version of the collision is accepted she was at fault in respect of a proper lookout. Art. 29 of the Inland Rules, 33 U.S.C.A. § 221. Under the facts as the court has found them, I find little merit in the contention. Obviously the breakwater obscured the vision of the bow and starboard watch as the California approached this point. It is true that the bow watch and the captain of the California did not see the Curlew until the former was 150 feet beyond buoy N6, but it is not reasonable to find fault on California's part for not seeing the Curlew before she did, in view of the unusual and bizarre direction in which the Curlew was headed. The latter was far outside the starboard side of

the channel, where the California would ordinarily expect the Curlew to be, in violation of Art. 25 of the Inland Rules, 33 U.S.C.A. § 210. I cannot find inefficiency on the part of the lookouts in the light of the circumstances present here.

There was no fault on California's part with respect to signals. As found, she gave the danger signal required by Art. 18 of the Inland Rules, 33 U.S.C.A. § 203, Rule III, and she gave it promptly. The Curlew gave none and was at fault in this respect under the circumstances as found here.

It is the contention of the Curlew that on California's own story this is a crossing case and the California, with the Curlew on her starboard, was at fault in failing to keep out of the way of the Curlew. Art. 19, Inland Rules, 33 U.S.C.A. § 204, and also by her failure to avoid crossing ahead of the Curlew. Art. 22, Inland Rules, 33 U.S.C.A. § 207. The short answer to the Curlew's contention is that the rules relied upon do not apply to the situation here. As the case of Borcich v. Ancich, 9 Cir., 191 F.2d 392, at 395 states: "This rule presupposes two vessels which are in sight of each other and can continually check on each other's position". United States v. The Australia Star, 2 Cir., 172 F.2d 472, 474; Lind v. United States, 2 Cir., 156 F.2d 231, 233. The breakwater obstructed the view of the California and prevented the latter from seeing the Curlew until the Curlew was very close to the California. Furthermore, even if this were a crossing situation, the presence of the breakwater must be considered as a special circumstance that would relieve the California from turning to starboard instead of to port and go under the stern of the Curlew to avoid crossing ahead of the Curlew. Art. 22, Inland Rules, 33 U.S.C.A. § 207. It would be unreasonable, under the circumstances that confronted the California, to expect it to exercise the judgment that is based on hindsight rather than on an emergency that arose as a result of the Curlew's faulty navigation. California's conduct was all any one could reasonably expect under the circumstances that confronted it in order to avoid immediate danger. See Articles 27 and 29 of the Inland Rules, 33 U.S.C.A. §§ 212, 221.

It is further contended that there is room here for the application of the Stand-by Act, 33 U.S.C.A. § 367. It has no merit. There is no doubt here, in the court's opinion, as to whose fault caused the collision. Even if there was not sufficient proof that the Curlew caused the collision, yet California's captain, because of the tumult and cries of the crew that the California was sinking, was justified, as he testified, in at once heading for the beach to ground his boat and preserve the lives of his crew. It is true that California's pumps were later adequate to take care of the leakage and she reached her wharf in safety, but this does not detract in any way from the reasonable cause the captain had at the time of the collision to believe his boat was sinking.

Two other issues remain. The libel of Cusumano seeks to recover damages for the master and crew who were not part owners for loss of earnings. Borcich v. Ancich, supra, 191 F.2d at page 398, and cases cited, are decisive of this point. This court is in agreement with the language there to the effect that the crew's loss arises solely out of their contract with the owners of the California to fish aboard the vessel for a share of the catch, and following the reasoning in Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303, 308, 309, 48 S.Ct. 134, 72 L.Ed. 290, the crew members have no claim upon which relief can be granted.

Proctors for Costanzo in their answer claim the benefit of the defense of limitation of liability with respect to Mario Costanzo, a co-owner, who was below deck at the time of collision and not on watch at any material time. His co-owner, the captain of the boat, was in charge of navigation at the time of the collision although it is by no means certain that he was at the wheel. He cannot, as conceded, limit his liability. On the other hand, Mario Costanzo, co-owner, can invoke successfully the doctrine of non-privity under the circumstances. He did not participate in any of Curlew's faults or acts of negligence. The evidence did not show he was at the wheel

or gave directions with reference to the operation of the vessel and the evidence did not show he had knowledge of the operation of the boat just before and at the time of the collision. See Petition of Liebler, D.C., 19 F.Supp. 829, 833; In re Meyer, D.C., 74 F. 881; In re Leonard, 14 F. 53; The Maria and Elizabeth, 12 F. 627.

I find that the collision was due to the sole fault of the Curlew. I find that at the time of the collision, the navigation of the Curlew was in charge of an incompetent person; that she was at fault in cutting across the channel at an immoderate rate of speed under the circumstances. Further, I find that when the danger was apparent the Curlew did nothing to avoid the collision which, of course, included a failure to slacken her speed, a failure to reverse her engines, a failure to change her course, and a failure to sound signals.

A decree will be entered in No. 51–4 allowing libelants damages, with interest and costs, in accordance with this opinion. The libel in No. 51–16 is dismissed with costs to respondents. A reference will be made to a Commissioner.